**GEIGER READY–MIX COMPANY OF KANSAS CITY, INC., et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 95–1081.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 1995.

Decided July 5, 1996.

Mark G. Arnold, Washington, argued the cause, for petitioners.

David A. Fleischer, Attorney, National Labor Relations Board, argued the cause, for respondent. Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, were on brief.

Before: WALD, BUCKLEY and HENDERSON, Circuit Judges.

Opinion for the court filed PER CURIAM.

PER CURIAM:

In early 1992 the petitioner closed its only unionized cement mixing facility, laid off the employees who worked there, increased production at its nonunion plants and, after several weeks, reopened the former unionized facility with nonunion workers—all without notifying the employees' union. The National Labor Relations Board (NLRB or Board) concluded that the company failed to bargain with the union over "terms and conditions of employment," thereby violating the National Labor Relations Act (Act), see 29 U.S.C. § 158, and ordered the company to offer employment and back pay to all of the laid off employees. Deferred Appendix (DA) 60 n.19. The company petitions us to vacate the Board's order and the Board cross-petitions for enforcement of its order.

We uphold the Board's finding that the company violated its statutory duty to negotiate "terms and conditions" of employment with the union and agree that the company must compensate the laid off employees for their losses caused by its proscribed conduct. We differ with the NLRB, however, over whether restoring the status quo requires the company to provide back pay and employment to *all* union employees. Accordingly, we enforce the remedial order only in part and remand for the Board's further consideration.

## I. Background

Geiger Ready–Mix Co. of Kansas City, Inc. (Geiger or company) owns four "ready-mix" concrete facilities in the Kansas City metropolitan area. Geiger buys ready-mix cement, mixes the cement with "various types of sand, rock, and water" and sells the resulting product—concrete—to contractors. *See* DA 38 n.8. Its central facility, near two highways and closest to the downtown area, is the Speaker Road facility (Speaker Road) in Kansas City, Kansas. The facility in Liberty, Missouri is to the northeast of Kansas City, the facility in Leavenworth, Kansas is twenty-five miles to the northwest and the facility in Lenexa, Kansas is to the southwest. Although each of Geiger's four plants is owned by a separate company, the Geiger family owns and operates the four companies and the parties have stipulated that the four comprise a single employer. *See Radio & T.V. Local 1264 v. Broadcast Serv.,* 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965).

Geiger owns both union and nonunion cement mixing facilities, making it a "double breasted operation." Speaker Road is the only facility with union employees; the Lenexa plant has always been nonunion and the Leavenworth and Liberty facilities have been nonunion since 1989. In 1992 Speaker Road's twenty-five drivers, mechanics and batchmen were represented by Building Ma-

terial, Excavating, Heavy Haulers, Drivers, Warehousemen and Helpers, Local Union No. 541, affiliated with the International Brotherhood of Teamsters, AFL–CIO (Local 541 or union). Under a collective bargaining agreement between Local 541 and the Concrete Producers Association of Metropolitan Kansas City, a multiemployer bargaining association of which Geiger is a member, the Speaker Road drivers, mechanics and batchmen were paid approximately $5 to $6 more an hour than the nonunion drivers, mechanics and batchmen at Geiger's other three facilities.

The dispatcher for all four plants is located at Speaker Road. In early 1992 he used the following criteria to decide which facility mixed and batched the concrete and which truck delivered the concrete to the customer. Because concrete made with ready-mix cement must be used soon after it is prepared, the facility nearest to the customer usually delivered concrete to that customer. Some customers, such as contractors for large construction projects, ordinarily insisted that only union employees mix and deliver their concrete. Regardless of proximity, only Speaker Road supplied concrete to the union-insistent customers. Moreover, only Speaker Road drivers delivered Speaker Road concrete. The dispatcher also considered which plant had a truck available so that in general there was "an interchange of deliveries among the four plants with regard both to particular jobs and particular customers." DA 39.

## II. "Closing" Speaker Road

On January 10, 1992 Geiger announced by memorandum to the Speaker Road employees that it was that day closing the facility for an "indefinite" period of time. The company stated that it was laying off all twenty-eight Speaker Road employees, including the twenty-five drivers, mechanics and batchmen represented by Local 541. After the announcement, Geiger notified Local 541 of the closing. Approximately two months later

Geiger reopened Speaker Road with non-union employees.

On July 8, 1992 Local 541 filed an unfair labor practice charge against Geiger.[1] After a hearing, the Administrative Law Judge (ALJ) issued a report with findings and recommendations. On review, the NLRB adopted the ALJ's conclusions, deciding that Geiger had violated section 8(a)(5) and 8(a)(1) of the Act by "unilaterally halting operations at the unionized Speaker Road plant, laying off unit employees, and transferring unit work to nonunit employees without first giving the Union notice and an opportunity to bargain." DA 57–58. The NLRB also found that Geiger had violated section 8(a)(5) and 8(a)(1) by failing to give copies of its customer lists to Local 541, which lists the ALJ termed "crucial to the Union in representing the interests of laid-off members who may have been enlisted to perform the work in question," DA 50, and by failing to "bargain with the Union over the effects of its decision." DA 58 n.8. The NLRB ordered Geiger to return to Speaker Road "all bargaining unit work transferred out of that unit to nonunit employees." DA 60. The NLRB also ordered Geiger to "offer to all employees of the Speaker Road, Kansas City, Kansas plant who were laid off on January 10, 1992, full and immediate reinstatement to their former or substantially equivalent positions, and make them whole for any loss of pay or benefits." DA 61.

## III. NLRA Violations

Arguing that the holding in *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), provides the relevant legal framework, Geiger asserts that it was not required to bargain with the union. We disagree and conclude instead that the NLRB correctly applied the reasoning set forth in *Road Sprinkler Fitters Local Union v. NLRB*, 676 F.2d 826 (D.C.Cir.1982) *(Sprinkler Fitters I)*, and that substantial evidence supports its finding that Geiger unlawfully transferred unit work. We begin by reviewing several cases that

---

1. Two other unions representing Speaker Road employees (two operating engineers and a labor-

er) did not challenge Geiger's actions.

interpret the "terms and conditions" language of the Act.

## A. Cases interpreting "terms and conditions of employment"

■ The Act requires an employer to "bargain collectively" with the union.[2] To "bargain collectively" means to "confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). The "good faith" requirement forecloses "[u]nilateral action by an employer without prior discussion with the union." *NLRB v. Katz*, 369 U.S. 736, 747, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230 (1962). An employer that "unilaterally" changes the "terms and conditions of employment" violates the Act. *Id.* at 743, 82 S.Ct. at 1111.

The first of two notable Supreme Court decisions interpreting "terms and conditions of employment" is *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). In *Fibreboard* the company laid off its union maintenance employees and hired an independent nonunion company to service its facility. The Court described the company's decision to "contract out" the maintenance work as "replac[ing] existing employees with those of an independent contractor to do the same work under similar conditions of employment." *Id.* at 213, 85 S.Ct. at 404. The Court held that the company's decision was within the Act's "terms and conditions of employment" language and that its unilateral action violated the Act. *Id.* at 209, 85 S.Ct. at 402.

In *Sprinkler Fitters I*, this Court considered the meaning of "terms and conditions of employment" as applied to a double breasted employer. 676 F.2d at 826. The employer's union side worked on large installation projects and its nonunion side worked on small jobs. After two years of double breasted operations, the employer began submitting (and winning) bids for the nonunion side to do the large projects and the number of

union employees consequently declined. The union complained that the employer did not bargain with the union before submitting bids for its nonunion employees to do work on large projects but the NLRB disagreed, concluding that union "'acquiescence'" permitted the new bidding practice. *Id.* at 833. Granting the union's petition, we declared that the "crucial determinant is whether the change in relative economic fortunes was due to external circumstances or to a change in the employer's established practices." *Id.* at 832. We remanded to the Board to determine "whether [the employer] changed the method of allocating work between the [union side and nonunion side] so as to have caused the [union side] to lose work which, in light of [the employer's] past practices, [the union side] would otherwise have been expected to perform." *Id.* at 831–32; *see id.* at 831 (applying *Fibreboard* holding that "allocation of work to a bargaining unit is a 'term and condition of employment,' and an employer may not unilaterally attempt to divert work away from a bargaining unit without fulfilling his statutory duty to bargain").

Meanwhile, the Supreme Court decided *First National Maintenance*, involving a maintenance company's decision to cancel a customer's contract following a fee dispute and its subsequent firing of the union employees it had hired to service the customer. 452 U.S. at 666, 101 S.Ct. at 2573. The Court concluded that "the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained though the union's participation in making the decision, and we hold that the decision itself is *not* part of § 8(d)'s 'terms and conditions.'" (emphasis in original, footnote omitted). *Id.* at 686, 101 S.Ct. at 2585. Although in a footnote the Court "intimate[d] no view as to other types of management decisions, such as plant relocations," *id.* at 686 n. 22, 101 S.Ct. at 2585 n. 22, we have

---

**2.** Section 8(a)(5) of the Act makes it an unfair labor practice for the employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Section 8(a)(1) provides in part that "[i]t shall be an unfair labor practice for an employer to interfere

with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [section 7 of the Act]." 29 U.S.C. § 158(a)(1). Among section 7 employee rights is the right to "bargain collectively." 29 U.S.C. § 157.

since approved the Board's application of *First National Maintenance*'s balancing approach to plant relocation decisions. *See Dubuque Packing Co.,* 303 N.L.R.B. 386 (1991), *enf'd,* 1 F.3d 24, 31–32 (D.C.Cir.1993) (employer must bargain before "a relocation[ ] that leave[s] the firm occupying much the same entrepreneurial position as previously, that [was] taken because of the cost of labor, and that offer[s] a realistic hope for a negotiated settlement").

On appeal from the *Sprinkler Fitters I* remand, the employer argued that under *First National Maintenance*'s balancing test it was permitted to change its bidding practice without bargaining. *Road Sprinkler Fitters Local Union v. NLRB,* 789 F.2d 9, 16 n. 22 (D.C.Cir.1986), (*Sprinkler Fitters II*). Referring to the *Sprinkler Fitters I* decision, we rejected the argument because "the law of this case is otherwise." *Id.* We found the *Fibreboard* decision a "more apt precedent" and "reaffirmed the principle that the diversion of bargaining unit work is a mandatory subject of bargaining." *Id.* Noting that the nonunion and union sides competed for many of the same customers and that the nonunion side's work "increased dramatically" while "during the same period" the union side's work "dropped abruptly," we concluded that substantial evidence supported the Board's findings that "market circumstances had little to do with the change in the allocation of work" and that instead the employer's "diversion of bargaining unit work" had caused the change in "relative fortunes" between the union and nonunion sides. *Id.* at 14–15.

**B. Order Under Review**

Reviewing a Board order, we ask whether the NLRB's decision is reasonable under the Supreme Court's pronouncements. *See Dubuque Packing Co.,* 1 F.3d at 28; *see also Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979) ("Construing and applying the duty to bargain and the language of § 8(d), 'other terms and conditions of employment,' are tasks lying at the heart of the Board's function."). In this case, our reasonableness review requires us to assess whether the NLRB selected the appropriate legal framework and,

if so, whether the NLRB's application of the appropriate legal standard is supported by substantial evidence. *See* 29 U.S.C. § 160(e). Because the NLRB's selection and application of our *Sprinkler Fitters* precedent is reasonable, we affirm its finding that Geiger violated the Act.

1. Legal Framework of Reasonableness

■ The NLRB's order applied the *Fibreboard, First National Maintenance* and *Sprinkler Fitters I* holdings to Geiger's actions. It first found "controlling" *Mid–State Ready Mix, Torrington Industries, Inc. v. Local Union No. 182,* 307 N.L.R.B. 809 (1992), a Board decision which applied *Fibreboard*'s "same work under similar conditions of employment" test to a double breasted ready-mix cement company. DA 59. Although calling the analysis "unnecessary," the Board noted "the subcontracting decision here is within the category of decisions that . . . the Supreme Court in *First National Maintenance* . . . concluded were subject to a balancing test." DA 59 n.16. It decided Geiger's actions were based "primarily on labor costs" and concluded Geiger's "decision[s] presents an even stronger case for finding a duty to bargain than the employer's decision in *Torrington.*" DA 59. The Board then gave a *Sprinkler Fitters I* rationale for its decision: "[R]egarding [Geiger's] transfer of unit work to its nonunion plants, the Board has found that an employer violates Section 8(a)(5) and (1) of the Act by reassigning work performed by bargaining unit employees to others outside the unit without affording notice." DA 59.

As the NLRB's multiple approaches suggest, there may be as many as three ways to analyze the case. Geiger (1) *replaced* union workers with nonunion workers when it reopened Speaker Road (implicating *Fibreboard/Torrington*'s "same work under similar conditions of employment" test); (2) *relocated* the plant when it moved production from Speaker Road to Lenexa (implicating *First Maintenance/Dubuque*'s balancing test), *compare* DA 59 ("closure of the Speaker Road plant and the accompanying layoff of the unit employees did not constitute a relocation of unit work within the *Dubuque*

test.... [Geiger] did not 'relocate' the Speaker Road facility") *with* (Pet'nr Br. at 17) ("NLRB's refusal to apply *Dubuque Packing* to Geiger's decision ... is not reasonably defensible"); or (3) *reassigned* unit work from the union to the nonunion side of its double breasted operation (implicating *Sprinkler Fitters I*'s transfer of unit work test). The case's elusive nature "counsels against strict categorization according to the form of subcontracting," *Furniture Rentors of Am., Inc. v. NLRB*, 36 F.3d 1240, 1248 & n. 4 (3d Cir.1994), because, as the Supreme Court instructs, the focus is whether "requiring bargaining over this sort of decision will advance the neutral purposes of the Act." *First Nat'l Maintenance*, 452 U.S. at 681, 101 S.Ct. at 2582. Following Supreme Court language that emphasizes the fact-specific nature of "terms and conditions" cases,[3] we find *Sprinkler Fitters I* and *II*, which also involved a double breasted employer, the most apt precedent and conclude that the NLRB's reliance on the "transfer of unit work" approach is reasonable.

We pause to note that the *Sprinkler Fitters* approach, which we further describe below, is not inconsistent with the Third Circuit's analysis in *Furniture Rentors*, a case not involving a double breasted operation. *See Furniture Rentors*, 36 F.3d at 1245–50 (remanding to Board to determine benefits, if any, of requiring employer to bargain with union before hiring independent company in response to union employee theft). In *Furniture Rentors*, the Third Circuit cautioned against a broad reading of *Torrington*. *See Furniture Rentors*, 36 F.3d at 1247 ("Inflexibly applied, the holding in *Torrington* is at odds with the principles of *Fibreboard* and *First National.*"). The Third Circuit rightly pointed out that whether unilateral action violates the Act depends less on the "*form* that the employer's decision takes" and more on the "reasons motivating the decision." *Id.* at 1248 n. 4 (emphasis in original). "If the employer's decision was prompted by factors that are within the union's control and therefore 'suitable for resolution within the collec-

tive bargaining framework,' *Fibreboard*, 379 U.S. at 214, 85 S.Ct. at 404, then bargaining is mandatory." 36 F.3d at 1248. Under *Sprinkler Fitters I*, the employer can unilaterally respond to "external circumstances" but cannot unilaterally change its "established practice" of assignments between its union and nonunion sides. 676 F.2d at 832. A change in the employer's *established* use of its union and nonunion sides in work assignments will almost always involve factors within the union's control. Thus under *Sprinkler Fitters I* Geiger's actions required pre-implementation bargaining in order to "advance the neutral purposes of the Act." *First Nat'l Maintenance*, 452 U.S. at 681, 101 S.Ct. at 2582.

### 2. Substantial Evidence

Geiger makes two challenges to the Board's finding that it illegally transferred bargaining unit work namely, (1) there was no unit work to transfer and (2) even if unit work was transferred, external circumstances dictated the transfer. There is, however, substantial record evidence to support the NLRB's contrary finding.

In *Sprinkler Fitters I* we described two types of double breasted operations. In one, the "employer's established practice [is] to assign to the union side only work that requires union labor, and to assign all other work, of whatever size or type, to the nonunion side." 676 F.2d at 832. In the second, the union side does work for customers *not requiring* union labor: "A union company is perfectly capable of doing work that does not require union labor." *Id.* If customers "decided on their own no longer to require union labor," whether the union side dies "a natural death" from "external circumstances" or whether the "change in relative economic fortunes" is caused by "a change in the employer's established practices" (and hence whether "the solicitation of a given piece of work on behalf of, or the assignment of that work to, the nonunion side of a double-breasted operation constitutes a transfer of

---

**3.** *See Fibreboard,* 379 U.S. at 218, 85 S.Ct. at 407 (Stewart, J., concurring) (noting that Court limited decision to "facts of this case" and concurring "[w]ithin the narrow limitations implicit in the

specific facts of this case"); *First National Maintenance Corp.,* 452 U.S. at 687, 101 S.Ct. at 2585 ("[T]o illustrate the limits of our holding, we turn again to the specific facts of this case.").

work from the union side") depends on which type of double breasted operation the employer operates. *Id.*

Geiger asserts that the first *Sprinkler Fitters* type, where the union side works only for customers insisting on union workers, "accurately described the instant case." (Pet'r Br. at 33.) Geiger asserts that the union side of its "classic double-breasted operation" died a "natural death" (Pet'r Br. at 31) because, as its memorandum closing Speaker Road noted, "demand and price for union ready mix has decreased markedly over the last few years." DA 39.[4] Accordingly, Geiger argues it did not transfer unit work because no unit work remained.

The Board found that Geiger's circumstances fit the second *Sprinkler Fitters* type. Both the central location of Speaker Road and the need to deliver the product quickly made using that facility to supply nonunion-only customers an economically sound decision. The ALJ found, and the Board agreed, that thirty per cent of Speaker Road's 1991 *product* was delivered to nonunion-only customers. He also found that forty per cent of Speaker Road's 1991 *customers* did not require union concrete. There is therefore substantial evidence to support the Board's finding that Geiger's established practice was to assign to Speaker Road work for customers not requiring union concrete and that therefore "unit work was available to be transferred out of the unit in January 1992." DA 58. *See Sprinkler Fitters II,* 789 F.2d at 14–15.

■ Geiger next argues that *it* did not decide to transfer unit work. Rather, the "industry structure" (Pet'r Br. at 24) was an "external circumstance," *Sprinkler Fitters I,* 676 F.2d at 832, that caused the transfer of work. Its argument has several steps. Geiger describes its competitors as large cement companies who, like Geiger, use union employees to mix and deliver concrete but, unlike Geiger, profit from their *cement* sales and not from mixing and delivering concrete.

Because its competitors do not profit from the mixing and delivery services, while these are Geiger's only sources of profit, Geiger maintains that it can survive only if its labor costs are lower than its competitors' labor costs. Geiger then claims that Local 541, which also represents other employees in the region, requires that all batchmen and drivers in the region receive the same pay, regardless of employer, and thus would not have agreed to the company-specific wage reduction Geiger claims is necessary for it to compete. Accordingly, Geiger argues "external circumstances" caused the transfer of work and it was under no obligation to bargain with the union.

We conclude, however, that substantial evidence supports the Board's conclusion that *Geiger* transferred work from the union to the nonunion side. Geiger "had the power, within broad limitations, to adjust [the union employee's] percentage [of work] and ... that is just what it did." DA 47. In 1991 Geiger produced approximately 227,400 cubic yards of concrete and, of that amount, 78,000 cubic yards at Speaker Road. The following year Geiger again produced 227,400 cubic yards of concrete, although Speaker Road, its hub, decreased production (from 78,203 to 23,788 cubic yards) while all its other facilities increased production (*e.g.,* production at the Lenexa facility increased from 27,179 cubic yards in 1991 to 61,332 cubic yards in 1992). The ALJ attributed the decline in work at Speaker Road to a "cost-cutting exercise aimed at replacing higher priced drivers with lower priced drivers." *Id.* The ALJ concluded that the "loss of bargaining unit work at Speaker Road was not the result of impersonal market forces," DA 48, and the Board, adopting the ALJ's view, reasonably concluded that *Geiger* "reassign[ed] work performed by bargaining unit employees to others outside the unit." DA 59. *See Sprinkler Fitters II,* 789 F.2d at 15.

To sum up, we uphold the Board's finding that Geiger violated section 8(a)(1) and 8(a)(5) of the Act by failing to bargain. Geig-

---

4. On appeal, Geiger attributes the loss of union insistent customers to its decision to stop selling concrete to union-only customers. In response, the Board disputes that Geiger made the decision, pointing out that the company's January 10th closing memorandum did not mention it. *See* note 5. Neither the ALJ nor the Board, in their respective orders, notes that Geiger made such a decision, and Geiger nowhere suggests it made the argument below. *See* DA 47.

er concedes that if it violated the Act by failing to bargain, it also violated section 8(a)(1) and 8(a)(5) by not providing information the union requested. In addition, Geiger does not contest the NLRB's conclusion that it violated section 8(a)(1) and 8(a)(5) by not bargaining about the effects of the plant closing. Accordingly, we also affirm these two Board findings.

## IV. Remedy

▄▄▄ Although we conclude that Geiger violated the Act, we do not agree *in toto* with the Board's remedial order. The NLRB's remedial aim is "to 'restor[e] the economic status quo that would have obtained but for the company's wrongful [action.]'" *Southwest Merchandising Corp. v. NLRB*, 53 F.3d 1334, 1344 (D.C.Cir.1995) (quoting *NLRB v. J.H. Rutter–Rex Mfg. Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969)). Where, as here, a double breasted employer unlawfully departs from "the pattern of allocation established by the past practice," *Sprinkler Fitters I*, 676 F.2d at 831, restoring the status quo requires returning the unlawfully transferred work and reinstating those union employees who would have done that work. *Sprinkler Fitters II*, 789 F.2d at 16–17. The NLRB correctly ordered Geiger to "transfer back to the Speaker Road bargaining unit all bargaining unit work transferred out of the unit to nonunit employees." DA 61. The Board did not specify how much work Geiger had to return to Speaker Road, declaring that it left to the compliance stage the "determination of the quantity of [Geiger's] work that constitutes 'unit work' for purposes of effectuating the terms of the Order." DA 60. But the Board did order Geiger to offer to rehire, with back pay, *all* of the laid off Speaker Road employees. We decline to require Geiger to rehire all Speaker Road employees until the NLRB decides how much work was improperly transferred from Speaker Road. *See NLRB v. Special Mine Servs., Inc.*, 11 F.3d 88, 90 (7th Cir. 1993) ("When the Board defers decision, it ought to defer the application for enforcement as well.").

To support its reinstatement remedy, the Board must determine how much concrete the Speaker Road facility would have produced if Geiger had maintained its established assignment practices. In 1991 Geiger produced approximately 227,000 cubic yards of concrete, 78,203 of that amount at Speaker Road. The next year, Geiger again produced approximately 227,000 cubic yards of concrete. The NLRB could estimate that absent the proscribed conduct Geiger would have each year since 1991 produced approximately 78,000 cubic yards at Speaker Road. The estimate is complicated somewhat, however, by the undisputed ongoing decline in "demand and price for union ready mix." DA 39. Sixty per cent of Speaker Road's 1991 deliveries, and seventy per cent of that year's production, went to customers that insisted on union concrete. The amount of concrete batched at and delivered from Speaker Road which served primarily union-only customers, might well have declined even if overall production remained constant. On the other hand, union-only customers were replaced by less particular customers, *see* DA 46 (Geiger's 1992 sales to nonunion-only customers increased "dramatically" over its 1991 sales), and its established practice indicates that it would have assigned some, although not all, of the new work to its centrally located Speaker Road facility. Indeed, in 1991 Speaker Road delivered approximately 23,000 cubic yards to nonunion-only customers. The Speaker Road drivers also delivered nonunion concrete from the Lenexa and Liberty facilities when it was convenient for them to do so. The NLRB should weigh the increase in nonunion-only customers together with the decrease in union-insistent customers to determine how much concrete the Speaker Road plant would have batched after 1991 had Geiger not deviated from its established practice. Once the Board determines the volume of unlawfully transferred unit work, it can then determine the number of employees Geiger must rehire at Speaker Road as well as how many former Speaker Road employees are entitled to back pay.

*So ordered.*