# United States Court of Appeals
## For the First Circuit

No. 08-1351

PAN AMERICAN GRAIN CO., INC. and
PAN AMERICAN GRAIN MANUFACTURING COMPANY, INC.,

Petitioners, Cross-Respondents,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner.

ON PETITION FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Boudin, Stahl, and Lipez,
<u>Circuit Judges</u>.

Rafael J. Lopez with whom Ruperto J. Robles was on brief for petitioner.
Greg P. Lauro with whom Meredith L. Jason, Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, and National Labor Relations Board were on brief for Respondent, Cross-Petitioner.

February 24, 2009

**STAHL**, **Circuit Judge**. Pan American Grain Company, Inc. and Pan American Grain Manufacturing Company (collectively, "Pan American" or "the company")[1] petition this court to set aside an order of the National Labor Relations Board ("the Board"). The Board submits a cross-application to enforce its order. We previously vacated and remanded the Board's order finding that Pan American, a Puerto Rican company, committed violations under the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 151 et seq., when it did not provide its employees with adequate notice and a reasonable opportunity to bargain before imposing layoffs. N.L.R.B. v. Pan Am. Grain Co., 432 F.3d 69 (1st Cir. 2005). Now, satisfied with the Board's supplemental decision and order issued in response to our remand, we deny Pan American's petition for review and grant the Board's cross-application for enforcement.

**I.**

The background facts of this case are discussed at greater length in our first examination of the Board's order, see id., and here, we relate them summarily. On January 8, 2002, employees at two Pan American facilities began a strike after negotiations failed at reaching a new collective bargaining agreement between Pan American and the exclusive bargaining representative for its employees, the Congreso de Uniones

_____

[1] Pan American Grain Company, Inc. and Pan American Grain Manufacturing Company are affiliated business enterprises and share officers, directors, and a common policy for operations.

Industriales de Puerto Rico ("the Union"). That same month, company president Jose Gonzalez spoke with two nonstriking truck drivers; during the conversation, Gonzalez stated that he "would rather close the company" than reach an agreement with the striking employees, called the strikers "jerks" and "sons of bitches," and indicated he would not be concerned if it cost $2 million to rid the company of them. On February 27, 2002, Pan American notified the Union that it had decided to lay off fifteen striking employees. A letter from Pan American to the Union, dated the same day, stated that the layoffs were "due to economic reasons and as a result of a substantial decrease in production and sales." Gonzalez later confirmed that sales dropped in January and February 2002 and conceded that the reduced level of sales caused the company to require "a lower work force."

Previously, in 1996, Pan American had begun to modernize its facilities' equipment to satisfy an environmental order which required significant changes in how the company conducted its business operations. The modernization resulted in decreased staffing needs and a reduction of one or two employees in each succeeding year. After the February 27 layoffs, Pan American initially did not cite its modernization program as a reason for the layoffs. But after the Union filed unfair labor charges with the Board, Pan American contended before a Board administrative law

judge ("ALJ") that the layoffs were attributable to the modernization program.

After a thirty-two-day trial, the ALJ found that Pan American had violated the Act "by implementing the February 27 layoff without giving the Union adequate notice and reasonable opportunity to bargain."[2]  Although the ALJ found the evidence of modernization and automation compelling enough to rebut a discrimination claim under 29 U.S.C. § 158(a)(3), the judge determined the striking employees were engaged in protected activity, found that antiunion animus existed, and noted that the timing of the layoffs in relation to the commencement of the strike was "somewhat suspicious" in reaching his conclusion that Pan American's February 27 layoffs violated the Act under 29 U.S.C. § 158(a)(5).[3]  As a remedy for the violation, the ALJ ordered full backpay to and reinstatement of the fifteen employees.  The Board affirmed the ALJ's ruling and adopted the recommended order.

---

[2] The Union alleged other violations, roughly half of which the ALJ found substantiated.  These violations are not at issue in the instant appeal as Pan American has not contested them.  See Pan Am. Grain, 432 F.3d at 71, n.2.

[3] "It shall be an unfair labor practice for an employer--to refuse to bargain collectively with the representatives of his employees."  29 U.S.C. § 158(a)(5).  See also id. at § 158(d) ("[T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment.").

On its first appeal to this court, Pan American asserted that because of the role of its modernization program in the layoffs, it was not required to bargain over the decision to terminate the fifteen employees, only over the effects of the layoffs, see generally First Nat'l Maint. Corp. v. N.L.R.B., 452 U.S. 666 (1981), and that the appropriate remedy therefore was limited backpay as prescribed in Transmarine Navigation Corp., 170 N.L.R.B. 389 (1968). A majority of the panel[4] held that the Board had not sufficiently explained why Pan American had to bargain over a decision motivated both by reduced sales and a modernization program. Pan Am. Grain Co., 432 F.3d at 74. We thus remanded the case to the Board for clarification of how multiple motives for a layoff should be analyzed and whether the Board viewed modernization decisions as mandatory subjects of bargaining.

In its supplemental decision and order, the Board found that "a combination of factors, including a substantial reduction in sales in January and February 2002. . . coinciding with the . . . strike" led to the February 27 layoffs such that the layoffs were motivated by reasons other than efficiency gains from modernization. The Board held that "because [Pan American] failed

---

[4] The dissent argued that Pan American's objections before the Board were insufficient to apprise the Board that the company would later argue that it had no duty to bargain about the decision. Pan American Grain Co., 432 F.3d at 75 (Stahl, J., dissenting). On remand, the Board observed that it too had understood Pan American's argument to be waived by its failure to present the argument to the Board in its exceptions to the ALJ's decision.

to establish it would have implemented any particular layoff solely as a result of modernization and even in the absence of its economic reasons, [it] had a duty to bargain over the February 27 layoff decision." The Board noted that it would have addressed this court's question of whether a company must bargain over layoffs arising solely because of modernization had Pan American established that any particular layoff was based exclusively on the modernization program. Based on this reasoning, the Board again found that Pan American had a duty to bargain with the Union over the decision to lay off fifteen employees, which "unquestionably affected the terms of unit employees' employment in a material and substantial way," and held that the company's unilateral implementation of the layoffs violated Sections 8(a)(5) and (1) of the Act. The Board again ordered a full backpay remedy.

## II.

We now consider whether the Board complied with our remand and sufficiently clarified its reasoning such that its finding that Pan American violated Sections 8(a)(5) and (1) of the Act and the subsequent remedial order are justified. The Board has the primary responsibility for determining the scope of an employer's statutory duty to bargain, Ford Motor Co. v. N.L.R.B., 441 U.S. 488, 496 (1979), and we will affirm the Board's statutory construction so long as it is "reasonably defensible," id. at 497. See Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)

("[A] court may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."). We treat the factual findings of the Board as conclusive if supported by substantial evidence on the record. Id. at 477-78; 29 U.S.C. §§ 160(e), (f). And because "the Act has granted the Board wide discretion in fashioning remedies," N.L.R.B. v. Mount Desert Island Hosp., 695 F.2d 634, 642 (1st Cir. 1982), we will not disturb a remedial order "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." N.L.R.B. v. Otis Hosp., 545 F.2d 252, 257 (1st Cir. 1976) (quoting Va. Elec. & Power Co. v. N.L.R.B., 319 U.S. 533, 540 (1943)).

Under the Act, an employer must bargain collectively with the representative of its employees over decisions affecting "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d); N.L.R.B. v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349 (1958). An employer violates this duty when he changes a mandatory term or condition of employment without giving the employees' representative adequate notice and an opportunity to bargain. N.L.R.B. v. Katz, 369 U.S. 736, 745-46 (1962); see 29 U.S.C. § 158(d).

Evaluating the scope of mandatory subjects of bargaining, the Supreme Court identified three categories of management

-7-

decisions in First National Maintenance Corp., 452 U.S. 666. Decisions that affect the employment relationship only tangentially, such as advertising and product design, are not mandatory subjects of bargaining. Id. at 676-77. Decisions directly affecting the relationship -- wages, working conditions, and the like -- are mandatory subjects of bargaining. Id. at 677. This requirement ensures that when an employer aims to reduce labor costs, employees are presented with the opportunity to negotiate concessions that reduce overall costs and thus spare jobs. Fibreboard Paper Prod. Corp. v. N.L.R.B., 379 U.S. 203, 213-14 (1964). Finally, some management decisions have a direct impact on employment but focus on economic profitability rather than the employment relationship. First Nat'l Maint. Corp., 452 U.S. at 677. An employer need not bargain over a decision "involving a change in the scope and direction of the enterprise" and not "'primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment.'" Id. (quoting Fibreboard Paper Prod. Corp., 379 U.S. at 223 (Stewart, J., concurring)). To determine the central thrust of decisions in this third category for mandatory bargaining purposes, the Court prescribed a balancing analysis -- "bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining

process, outweighs the burden placed on the conduct of the business." Id. at 679. The Court employed the balancing test to determine that bargaining was not required in the case before it but expressly noted that its analysis did not preclude different outcomes in other cases. Id. at 686, n.22.[5]

In its brief, Pan American contends that the Board did not comply with this court's remand instruction, see 432 F.3d at 74, requesting clarification on the appropriate analysis for a multiple motive layoff. Despite Pan American's characterization of this objection, we find the company is dissatisfied less with the Board's elucidation than with the result it has reached, namely that the company is in violation of the Act for failing to negotiate over the decision to implement layoffs and liable for a full backpay remedy. We address these findings in turn.

In its most recent decision, the Board explains that an employer must bargain over a multiple-motive layoff based partially on labor costs. See Regal Cinemas, Inc. v. N.L.R.B., 317 F.3d 300, 307-08 (D.C. Cir. 2003) (affirming the Board's finding of a Section 8(a)(5) violation where the layoff was motivated by labor costs rather than technological advances); Winchell Co., 315 N.L.R.B.

---

[5] Indeed, in our remand to the Board, we reflected the fundamental principle that the Board should develop labor policy, by observing that First National Maintenance Corp. "seemingly left open" the issue of whether layoffs prompted by modernization are mandatory subjects of bargaining. Pan Am. Grain Co., 432 F.3d at 74.

-9-

526, 530, 534-36 (1994), enforced mem., 74 F.3d 1227 (3d Cir. 1995) (holding that the employer must bargain over a layoff decision motivated both by a business downturn and business decisions including the installation of new technology); see also FiveCAP, Inc., 332 N.L.R.B. 943, 955 (2000). Pan American concedes that it cannot demonstrate that any particular layoff arose solely due to its modernization program,[6] and we note that there is substantial evidence, including the testimony of company president Gonzalez, supporting the Board's finding that the layoffs were motivated in part by the costs associated with the strike. Because labor costs were a motivating factor for the layoffs, the Board explained that the company had a duty to bargain with the Union over the layoffs. Acknowledging the clarity with which the Board responded to our remand, we find its position reasonably defensible and affirm.

Pan American argues that the Board "deviat[ed] from an established standard" and should have applied a modified form of the burden-shifting test announced in Dubuque Packing Co., 303 N.L.R.B. 386 (1991), enforced sub nom. U.F.C.W. Local 150-A v. N.L.R.B., 1 F.3d 24 (D.C. Cir. 1993), which was introduced to determine whether a plant relocation is a mandatory subject of

---

[6] In its brief, Pan American "recognize[s] that the February 27 layoff decision was based on a combination of factors," Brief of Petitioner at 26, and "acknowledges that the 'economic reasons' were a different consideration that caused the layoff in February 2002, . . . in addition to a chief factor, the automation project," id. at 30.

bargaining.[7]  This contention is untimely as Pan American did not present it to the Board on remand.  See 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court.").  Moreover, the Board has explicitly limited Dubuque to relocation decisions, see, e.g., Furniture Renters of Am., Inc. v. N.L.R.B., 36 F.3d 1240, 1246-47 (3d Cir. 1994), and Pan American belies its assertion that the Board deviated from "an established standard" when it suggests that the Board should have applied a modified form of a test developed for a different set of facts.

We remanded the Board's order because "we [did] not understand [its] rationale" and therefore could not "effectively review it."  Pan Am. Grain Co., 432 F.3d at 74 (citation omitted).  In its supplemental decision and order, the Board apprises us of the analysis it employs when layoffs are motivated by several reasons, one of which is labor costs, a mandatory subject of bargaining.  Its philosophical approach is not unlike the one it has adopted for discrimination claims where the employer contends that a legitimate business decision, rather than antiunion animus, explains the adverse action taken against the employee.  See, e.g.,

---

[7] The Dubuque test places an initial burden on the union to establish a prima facie case for mandatory bargaining by showing that the relocation did not include a change of operations.  303 N.L.R.B. at 391.  The employer then can rebut by showing that labor costs were not a factor in the relocation or that even if such costs were a factor, the union could not have offered concessions that could change the employer's decision to relocate.  Id.

Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981); see also N.L.R.B. v. Transp. Mgmt. Corp., 462 U.S. 393, 403 (1983) (holding that the employer bears the burden of negating causation in a mixed-motive discrimination case, noting "[i]t is fair that [the employer] bear the risk that the influence of legal and illegal motives cannot be separated."). Mindful of our deferential standard of review, we are content with the Board's explanation of the analysis employed, finding it reasonably defensible.

We turn finally to Pan American's assertion that the Board's remedial order is inappropriate. The company objects to the remedy based on its view that the layoff was a non-bargainable business decision,[8] a stance we have rejected. We defer to the Board's knowledge and expertise in fashioning remedies unless the order patently disregards the policies of the Act. Teamsters Local Union No. 171 v. N.L.R.B., 863 F.2d 946, 268 (D.C. Cir. 1988). The customary remedy for an employer's violation of Section 8(a)(5), reinstatement and full backpay, is "presumptively valid;" it aims to return the employee to the economic status quo before the employer's unilateral action. Regal Cinemas, Inc., 317 F.3d at

---

[8] It requests a remedy similar to the one issued in Transmarine Navigation Corp., 170 N.L.R.B. at 389-90, a case in which the Ninth Circuit reversed the Board, finding that the employer was not required to bargain over the layoff decision. In contrast, we have affirmed the Board's holding that Pan American violated Sections 8(a)(5) and (1) of the Act.

315; <u>Geiger Ready-Mix Co.</u> v. <u>N.L.R.B.</u>, 87 F.3d 1363, 1371 (D.C. Cir. 1996). <u>See,</u> <u>e.g.</u>, <u>Winchell Co.</u>, 315 N.L.R.B. at 536; <u>Compu-Net Commc'n, Inc.</u>, 315 N.L.R.B. 216, 225-26 (1994). We cannot say that the Board's choice of a conventional remedy for Pan American's unilateral discharge patently disregards the purposes of the Act.

We consider seriously, however, Pan American's argument that reinstatement constitutes an undue burden on the company, noting that it has never increased its workforce since the February 2002 layoffs. "[R]einstatement is an inappropriate remedy if it would be 'unduly economically burdensome' for the employer." <u>Regal Cinemas, Inc.</u>, 317 F.3d at 315 (quoting <u>Teamsters Local Union No. 171</u>, 863 F.2d at 957-58). The employer bears the burden of showing "that the Board's [remedial] order would require a substantial outlay of new capital or otherwise cause undue financial hardship." <u>Teamsters Local Union No. 171</u>, 863 F.2d at 958. While we enforce the Board's remedial order, we draw attention to its assurances both in its brief, Brief of Respondent at 31, n.17, and at oral argument that Pan American can provide evidence during the Board's compliance proceedings to show that reinstatement of the fifteen employees is unduly burdensome because the company no longer requires those positions for its operation. <u>See</u> <u>Compu-Net Commc'n, Inc.</u>, 315 N.L.R.B. at 216, n.3 ("[T]he Respondents may introduce previously unavailable evidence, if any, at the compliance stage of this proceeding to demonstrate that the reinstitution of those

-13-

operations is unduly burdensome.") (citing Lear Siegler, Inc., 295 N.L.R.B. 857 (1989)); E.I. Du Pont Nemours & Co. v. N.L.R.B., 489 F.3d 1310, 1317 (D.C. Cir. 2007) (discussing the appropriate procedure for developing an objection to the remedial order); West Penn Power Co. v. N.L.R.B., 394 F.3d 233, 246 (4th Cir. 2005) (same).

## III.

For the foregoing reasons, Pan American's petition for review is denied and the Board's cross-application for enforcement is granted.

**So ordered.**