ROCK–TENN COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Teamsters Local 728, Intervenor.

No. 96–1046.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 4, 1996.

Decided Dec. 17, 1996.

Larry E. Forrester, argued the cause, for petitioner, with whom Steven C. Ellingson, Atlanta, GA, was on the briefs.

David B. Schwartz, Attorney, National Labor Relations Board, argued the cause, for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Howard E. Perlstein, Deputy Assistant General Counsel, were on the brief. Paul J. Spielberg, Deputy Assistant General Counsel, Margaret G. Neigus, Supervisory Attorney, and Jill A. Griffin, Attorney, Washington, DC, entered appearances.

Before: EDWARDS, Chief Judge, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring statement filed by Circuit Judge HENDERSON.

SILBERMAN, Circuit Judge:

Petitioner challenges a National Labor Relations Board determination that it violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act by refusing to bargain with the Teamsters over its decision to permanently subcontract its trucking operations and by withdrawing recognition from the Union. We deny the petition and grant the cross-application for enforcement.

## I.

Rock–Tenn Company makes corrugated paper products in Norcross, Georgia. From Norcross, it sells and ships by truck finished products directly to customers. In June of 1992, Rock–Tenn's drivers selected Teamsters Local 728 as their collective bargaining representative. The Company and the Union had at least six negotiation sessions before the end of the year, but no collective bargaining agreement was reached. In March of 1993, SilverEagle Transport, Inc., which had been hauling "freight" out of Rock–Tenn's plant, submitted to Rock–Tenn a proposal by which SilverEagle sought to assume all of Rock–Tenn's trucking operations on an exclusive basis. Rock–Tenn told the Union during a negotiation session in July that SilverEagle's proposal was under consideration. The Union was informed that three factors made the move to subcontracting enticing: a large annual cost savings (including labor costs), the avoidance of potential liability from having its own fleet of trucks operating, and freedom from Department of Transportation regulations.

The day after the meeting, the Union formally demanded immediate bargaining directed specifically to the subcontracting issue. The next day, Gary Spence, a driver, asked Rock–Tenn's planning manager, Brannon Sims, about a rumor that the drivers would be laid off at the end of the month. Sims confirmed the rumor, according to Spence, and told Spence that the plant manager agreed that the layoff decision was final. Upon hearing this, Spence resigned.

The following day, Rock–Tenn wrote the Union that it had no duty to bargain over the subcontracting decision, but that it would do so nonetheless. Accordingly, the parties scheduled a negotiating session devoted to that subject, but sometime before the meeting, several drivers told the Union's business agent that the company called the meeting only to notify them that trucking operations were ending. Then, on the morning of the meeting, Rock–Tenn received a letter signed by four of the seven remaining drivers. It stated, in part:

I feel like the decision that has recently been made, besides the economy end of

it—has been because of the underhanded tactics that was used [sic] on the part of some of the union members.... Attached to this letter are the signatures of the drivers that feel [we no longer need a union].

Rock–Tenn representatives arrived at the meeting, the letter in hand, only to inform the federal mediator that it would not bargain with the Union because it no longer represented a majority of employees. The company's executive general manager, the day after, met with the remaining drivers to announce that Rock–Tenn would close down trucking operations at the end of the month. He then offered the drivers a severance package in return for their peaceful exit. On July 31, 1993, as promised, Rock–Tenn laid off all the drivers, thus eliminating the bargaining unit, and SilverEagle supplanted them.

The Board agreed with the ALJ that Rock–Tenn had made a final decision to subcontract its trucking operations by the time Sims spoke with Spence, and therefore violated §§ 8(a)(5) and (1) of the NLRA by doing so without bargaining. The ALJ, and subsequently the Board, also determined that withdrawal of union recognition constituted an unfair labor practice because the employees wrote their letter only in response to Rock–Tenn's unlawful decision to subcontract without bargaining. From these two findings, the Board readily agreed with the ALJ that the company's direct contact with Spence and the other employees violated the NLRA. The Board ordered Rock–Tenn, *inter alia,* to bargain with the Union, to offer reinstatement to the eight drivers, and to sever, if necessary, contractual relations with SilverEagle.

## II.

█ Petitioner contends that it was not obliged to bargain with the Union over its decision to subcontract its shipping service, but that in any event, it did, at least up to the point that it legitimately withdrew recognition. Of course the Board's conclusion regarding Rock–Tenn's duty to bargain turns on an interpretation of § 8(a)(5) of the Act, which imposes on an employer a legal obligation to bargain with a union (representing its employees) over "wages, hours, *and other terms and conditions of employment.*" 29 U.S.C. § 158(d) (1994) (emphasis added). That phrase is hardly self-explanatory, and so the Board's construction of it is entitled to *Chevron* deference. The Board has less room here than in the average case, however, because Supreme Court opinions have played a major role in marking off the boundaries of the ambiguous term "conditions of employment." We turn then to the decisional body of law. Essentially, petitioner's argument is that it was not obliged to bargain with the Union on the subcontracting issue because bargaining would have been futile: There was no way the Union could alleviate Rock–Tenn's concern over the significant liability risks it bore by having a fleet of trucks on the road, nor over the burden that Department of Transportation regulations imposed on Rock–Tenn. Moreover, SilverEagle's labor costs were so much lower that it would require each of Rock–Tenn's drivers to give up more than $25,000 a year to remain competitive—which, according to petitioner, is wildly unrealistic.

█ Petitioner relies on a recent Board decision that we affirmed, *United Food and Commercial Workers Int'l Union, AFL–CIO, Local 150–A v. NLRB,* 1 F.3d 24 (D.C.Cir. 1993) ("*Dubuque Packing*"), which dealt not with subcontracting but rather with plant relocation. The Board, in that case, held that the General Counsel has the initial burden to show only that a plant relocation decision is "unaccompanied by a basic change in the employer's operation" to establish a *prima facie* case that the employer's decision is a mandatory subject of bargaining. *Dubuque Packing Co.,* 303 N.L.R.B. 386, 391 (1991). But the employer can defeat the complaint if it can prove that labor costs were not a factor in its decision *or*—and this is a crucial "or"—that the Union could or would not have made sufficient concessions to have altered the employer's decision. *See Dubuque Packing,* 1 F.3d at 30.

The Board declined to apply the *Dubuque Packing* standard for relocation decisions (and, in particular, its futility exception) to this case, instead relying on the much earlier Supreme Court decision in *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85

S.Ct. 398, 13 L.Ed.2d 233 (1964), which dealt specifically with an employer's subcontracting decision. In *Fibreboard,* the Court held that the replacement of bargaining unit maintenance employees with those of an independent contractor "to do the same work under similar conditions of employment" is subject to mandatory bargaining. *Id.* at 215, 85 S.Ct. at 405. The Court specifically rejected, in the circumstances of that case, the employer's contention that bargaining would have been futile, observing that "it is not necessary that it be likely or probable that the union will yield or supply a feasible solution but rather that the union be afforded an opportunity to meet management's legitimate complaints that its maintenance was unduly costly." *Id.* at 214, 85 S.Ct. at 405 (internal quotation marks omitted). Justice Stewart wrote a separate concurring opinion, however, cautioning against a too doctrinal interpretation of *Fibreboard* that would apply it to core entrepreneurial decisions that might be described as subcontracting, pointing out that "all that is involved [in *Fibreboard*] is the substitution of one group of workers for another to perform the same task in the same plant *under the ultimate control of the same employer."* *Id.* at 224, 85 S.Ct. at 410 (Stewart, J., concurring) (emphasis added).

In the early post-*Fibreboard* period, the Board found virtually all subcontracting decisions subject to mandatory bargaining, though it insisted it was not adopting a *per se* approach, *see, e.g., Empire Dental, Co.,* 211 N.L.R.B. 860 (1974); *General Motors Corp.,* 191 N.L.R.B. 951 (1971); *Westinghouse Electric Corp.,* 150 N.L.R.B. 1574 (1965), and it did not define "subcontracting" as expansively as Justice Stewart feared. *See General Electric Co.,* 240 N.L.R.B. 703 (1979) (employer not required to bargain over subcontracting decision that did not involve work regularly or normally performed by bargaining unit employees). Then in 1981, the Supreme Court in *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318, held that a maintenance company that was providing service to commercial customers and that wished to discontinue its contract with one of those customers was not obliged to bargain with its union even though the employees dedicated to that contract were to be terminated. *See id.* at 686, 101 S.Ct. at 2584.

Although it might be thought that the First National Maintenance Corporation was an "employer" similar to the Fibreboard Paper Products Corporation, the Court saw a fundamental difference between the two: First National Maintenance was a *sub*contractor with a staff of employees, whereas Fibreboard was a contractor. The key distinction between the two cases is that in *Fibreboard* "[t]he maintenance work still had to be performed in the plant.... [T]he [c]ompany merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment." *Fibreboard,* 379 U.S. at 213, 85 S.Ct. at 404. In *First National Maintenance,* on the other hand, the subcontractor's abrogation of the contract obviously did not involve a plan to have the same work done by a different set of employees employed under the subcontractor's auspices and ultimate control. Rather, the Company's decision was a determination to "shut down part of a business," *First National Maintenance,* 452 U.S. at 680, 101 S.Ct. at 2581, "a significant change in [its] operations, a change not unlike opening a new line of business or going out of business entirely." *Id.* at 688, 101 S.Ct. at 2585. *Cf. Textile Workers Union of America v. Darlington Manufacturing Co.,* 380 U.S. 263, 273–74, 85 S.Ct. 994, 1001–02, 13 L.Ed.2d 827 (1965) (holding that an employer has the absolute right, at least as far as the NLRA is concerned, to terminate his entire business for any reason). The Court admitted, as the dissent emphasized, *see* 452 U.S. at 690, 101 S.Ct. at 2586 (Brennan, J., dissenting), that First National Maintenance's union might have been able to offer a wage concession to make the contract more profitable, but the Court was satisfied that the employer made its decision based not on its labor costs but instead on the customer's refusal to pay enough (the company claimed to be "losing money" on the relevant contract), and therefore this sort of decision fell within a category of management decisions where the bene-

fits of collective bargaining are outweighed by the "burden placed on the conduct of the business."[1] *Id.* at 679, 101 S.Ct. at 2581.

It is more than a little difficult to understand the Court's economic analysis, since any company's profitability can be enhanced equally by lowering costs as well as by increasing revenue. But the distinction drawn is more understandable when viewed in relation to the language of the NLRA—an explicit reference to labor costs seems to implicate a "term or condition of employment," 29 U.S.C. § 158(d), more directly than does the overall profitability of a business contract. *First National Maintenance* must be seen, then, as simply drawing a boundary—albeit a tenuous one—between decisions that appear to be driven *primarily* by labor cost considerations and those that are not; the latter are the more core entrepreneurial decisions which, as the Court noted, Justice Stewart spoke of in his concurring opinion in *Fibreboard.* *See* 452 U.S. at 677, 101 S.Ct. at 2580.

Although the Court in *First National Maintenance* described *Fibreboard* as having implicitly performed the same balancing analysis as did it, *see* 452 U.S. at 679, 101 S.Ct. at 2581, the question arose anew whether the logic of *First National Maintenance* implied that there were two different kinds of subcontracting decisions: *Fibreboard* subcontracting and those that fell on the *First National Maintenance* side of the divide which may or may not call for bargaining. And, was the burden-shifting procedural framework that the Board had developed for relocation decisions in *Dubuque Packing* the appropriate methodological approach to determine whether bargaining was required? Petitioner argues that the latter question should be answered in the affirmative. It will be recalled that *Dubuque Packing* allows an employer to avoid mandatory bargaining if it can show that, even if labor costs were a factor in its decision, it would not have been reasonable to expect the Union to make the

degree of concession necessary to render the subcontracting proposal sub-optimal.

The Board, in 1992, in *Torrington Industries,* 307 N.L.R.B. 809, acknowledged that there might well be a sort of subcontracting that should be treated as a core entrepreneurial decision,[2] but then concluded that so long as an employer simply substituted one group of workers for another, in Justice Stewart's words "under the ultimate control of the same employer," *Fibreboard,* 379 U.S. at 224, 85 S.Ct. at 410 (Stewart, J., concurring), the Board was faced with a *Fibreboard* prototype and it was not necessary to consider how strong a role labor costs played in the subcontracting decision. Thus, the Board refused to import its *Dubuque Packing* analysis into a classic *Fibreboard* situation regardless of the labor cost factor.

The Board subsequently applied *Torrington* in a case where an employer subcontracted trucking services, not because of labor costs, but because his union drivers were alleged to engage in theft, to prompt customer complaints for carelessness, and to perform less efficiently than the subcontractor's drivers. *Furniture Rentors of America, Inc.,* 311 N.L.R.B. 749 (1993). The Third Circuit thought the Board's *Torrington* doctrine was "ham handed," at least as applied in that case. *Furniture Rentors of America, Inc. v. NLRB,* 36 F.3d 1240, 1248 (3d Cir. 1994). It was not adequate, in our sister circuit's view, for the Board simply to determine that a case before it fit what the Board thought was the *Fibreboard* paradigm—the subcontractor's employees are to perform essentially the same work and there is no change in the direction and scope of the enterprise—to impose a bargaining obligation regardless of the employer's reasons for the change. The court saw productivity as akin to (but not quite the same thing as) labor costs, but in any event determined the

---

1. The Court conducted this balancing test after delineating a three-part framework for analyzing management decisions, *see id.* at 676–77, 101 S.Ct. at 2579–80, and concluding that First National Maintenance's decision fell into the "category" that required balancing. But, as is so often true with three-pronged tests, the content of the poles is clear, and only the middle category is in doubt.

2. *See also Oklahoma Fixture Co.,* 314 N.L.R.B. 958, 959–60 (1994), *denied enf. on other grounds,* 79 F.3d 1030 (10th Cir.1996), in which the Board did not require mandatory bargaining for a subcontracting decision that was based solely on the company's concerns with legal liability that could drive the company out of business.

other factors—theft and carelessness—to be the employer's primary concern and these were not amenable to collective bargaining. The Court did not hold that the *Dubuque Packing* analysis applied, but instead remanded to the Board for further consideration. *See id.* at 1250.

The short answer to petitioner is that we think the Board, in implementing the statute and interpreting the governing Supreme Court decisions, permissibly distinguishes what it calls a *Fibreboard* subcontract from a relocation decision. The latter is obviously closer to the core entrepreneurial decision that the Supreme Court concluded is not subject to mandatory bargaining at all. We need not, in this case, determine, as the Third Circuit concluded, that even if labor costs are a factor, if there are other dominant considerations like employee theft or carelessness that are simply not amenable to collective bargaining, a decision is taken out of the *Fibreboard* paradigm. In our case, it is rather obvious that the employer's primary concern was labor costs.[3]

The case comes down, then, to the question whether Rock–Tenn was entitled to show à la *Dubuque Packing* that it would have been futile to seek wage concessions from the Union to the degree that Rock–Tenn asserts would have been necessary to match Silver-Eagle's offer. The Board is authorized to insist that such an "argument" be presented first to the union in the bargaining context. The Board's reading of the governing Supreme Court opinions seems legitimate to us. The Board's rejection of petitioner's futility argument tracks closely the Supreme Court's language in *Fibreboard, see, e.g.,* 379 U.S. at 214, 85 S.Ct. at 404 ("[A]lthough it is not possible to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiation."), and nothing in *First National Maintenance* contradicts that

reasoning. That is not to say that the Board had no discretion in the matter; it is, however, a permissible reading of the statute in light of the Supreme Court opinions to hold that when a subcontracting decision turns on labor cost considerations and involves "the same work under similar conditions of employment," it is a prototype *Fibreboard* case regardless of the alleged futility of bargaining.

### III.

■ The rest of the case is easy. There is adequate support in the record for the Board's finding that, notwithstanding Rock–Tenn's obligation to bargain over the subcontracting decision, it had decided to subcontract and communicated that decision to employees before the union had a chance to bargain. Of course, the testimony of Spence and Sims differed as to what the latter told the former, but the ALJ credited Spence, and on this record that is enough; we are in no position to challenge that credibility finding. In any event, the employees' letter to management disavowing the union referred to "the decision that has recently been made," which clearly referred to the subcontracting decision. Petitioner's argument that the Board was obliged to find that the referenced decision was Rock–Tenn's determination to *consider* subcontracting is silly. For the same reason, the Board's determination that petitioner's withdrawal of recognition from the Union was unlawful is easily sustained. The employee letter was *obviously* provoked by the petitioner's subcontracting decision. Several of the employees had notified a union business agent before the letter was ever written that trucking operations were ending.[4]

\* \* \* \* \* \*

For the foregoing reasons, the petition for review is

*Denied.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:

---

3. It is not apparent why the subcontractor would have any lower liability costs (insurance premiums) than would Rock–Tenn. Indeed, even complying with regulatory requirements is in essence a labor cost burden, although it may or may not fall on bargaining unit employees.

4. Based on its findings that Rock–Tenn failed to bargain and unlawfully withdrew recognition of the Union, the Board reasonably treated the subsequent negotiation for severance and the lay off as unlawful.

I concur in the judgment and agree with the majority's dissection of relevant precedent only to the extent that it declares as "a permissible reading of the statute in light of the Supreme Court opinions" that an employer's subcontracting decision prompted by labor costs and resulting in "the same work under similar conditions" is a mandatory bargaining subject. Further, the employer here did not establish that bargaining would have been futile. Beyond that, under the facts of this case, it is not necessary to go.