REGAL CINEMAS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 01–1322.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 2002.

Decided Jan. 31, 2003.

Charles L. Warren argued the cause for the petitioner. Richard L. Wyatt, Jr. was on brief.

Fred B. Jacob, Attorney, National Labor Relations Board, argued the cause for the respondent. Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Robert J. Englehart, Attorney, National Labor Relations Board, were on brief. David S. Habenstreit and Ruth E. Burdick, Attorneys, National Labor Relations Board, entered appearances.

Before: HENDERSON, TATEL and GARLAND, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Regal Cinemas, Inc. (Regal) petitions for review of a June 20, 2001 decision and order of the National Labor Relations Board (Board or NLRB) finding that Regal violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (NLRA or Act), 29 U.S.C. § 158(a)(1), (a)(5), by refusing to bargain in good faith with three union locals before converting to"manager-operated" theaters and terminating its union-represented projectionists. On review, Regal argues that the Board erred in (1) concluding that Regal had a duty to bargain over its conversion to manager-operated theaters; (2) applying a "waiver analysis" to the management rights clause contained in the collective bargaining agreements between Regal and the unions; (3) failing to find that one of the union locals had waived its right to bargain over Regal's conversion decision

by failing to timely demand bargaining; and (4) ordering Regal to reinstate the terminated projectionists. We find that Regal's contentions are without merit and therefore deny its petition for review and grant the NLRB's cross-application for enforcement.

## I. Background

### A. Dedicated Projectionists and the Trend Toward Manager–Operated Theaters

Regal is a Tennessee corporation that operates movie theaters throughout the United States. Since its founding in 1989, Regal has expanded its business predominantly through the acquisition of existing theaters and smaller, regional theater chains. After an acquisition, Regal's practice has been to evaluate the existing equipment, physical layout and personnel in order to determine whether to convert the theater into a "manager-operated" theater. Joint Deferred Appendix (JDA) 484, 493–94. A typical movie theater employs a staff consisting of managers, assistant managers, concessionists, box office employees, ushers and projectionists. In a manager-operated theater, however, managers and assistant managers operate the projection equipment as part of their regular duties, thereby eliminating the need to employ dedicated projectionists. Over the past ten years, the general trend in the theater industry has been to eliminate the projectionist position and to convert to manager-operated theaters. JDA 486.

Today, the duties of a projectionist generally include the following tasks: "threading" the film through the projector at the beginning of each showing and disengaging the film at each showing's end; monitoring the film's focus and volume at the outset of each showing; preparing new films for the projector's continuous film platter by splicing together the film's multiple reels; performing the "breakdown" of older movies that are no longer being shown; changing movie "trailers" when necessary; fixing minor projector problems, such as broken belts and loose splices; and cleaning both the projection equipment and the projection booth. JDA 163–71, 210–21, 363–70, 432–35. The work required of a projectionist prior to the start of a film—threading the film, pushing the start button and checking the focus and volume—takes approximately five to ten minutes. JDA 202–03.

Not surprisingly, technological advances have greatly simplified the projection process and have thus eliminated many of the job duties originally performed by projectionists. As a result of the so-called platter system, for example, projectionists no longer need to change reels during a showing. JDA 190–91, 206–07. In addition, a computerized projection system now opens the curtains, changes the lighting, operates the sound system and automatically rewinds the film. JDA 189–96. Many of these advances in projection technology, including the platter system, occurred well before 1995, although none took place after 1995 and before the present litigation. JDA 208–09, 324, 351, 436–37.

### B. Regal's Bargaining History with the Union Locals

Regal's petition for review stems from its decision to convert its movie theaters in Richmond, VA, Fort Wayne, IN and Akron, OH to manager-operated theaters. This decision affected the membership of three local affiliates of the International Alliance of Theatrical and Stage Employees (IATSE): Local 370 (Richmond), Local 364 (Akron) and Local 125 (Fort Wayne). We recount the relevant bargaining history between Regal and the three union locals below.

### 1. Local 370

Regal acquired eight theaters in the Richmond, VA area in 1995. At the time of the acquisition, Local 370 had a collective bargaining agreement with Regal's predecessor that covered the projectionist employees at these theaters. JDA 529–539. With the collective bargaining agreement set to expire on June 15, 1995, Regal gave Local 370 notice of its intent to terminate the contract on April 17, 1995. JDA 602. Meeting with union representatives on May 22, 1995, Regal informed Local 370 of its intent to convert its Richmond theaters to manager-operated and to eliminate the projectionist position. JDA 197–98, 497. Upon further discussions with Local 370, however, Regal ultimately agreed to convert only three of the eight theaters. JDA 172–76. Accordingly, Regal and Local 370 entered into a collective bargaining agreement covering the projectionist employees at the remaining five theaters. JDA 586–92. The agreement contained a management rights clause, which read as follows:

> The COMPANY shall have the right to introduce new or improved work methods, facilities, equipment, machinery, processes and procedures of work and to change or eliminate existing methods, facilities, equipment, machinery, processes and procedures or work ... and to automate[.] [T]he COMPANY agrees to negotiate the effects [of such decisions] on the employees.

JDA 590 (redundant phrase omitted). According to Regal negotiators, the purpose of the management rights clause was to allow Regal to convert to manager-operated theaters without having to bargain with Local 370 beforehand. JDA 496. The parties did not discuss the management rights clause, however, during the 1995 negotiations.[1] JDA 176, 268–70. The agreement between Regal and Local 370 was effective from November 24, 1995 to November 23, 1997. JDA 586–92.

On September 22, 1997, Local 370 wrote to Regal requesting a meeting to discuss a new collective bargaining agreement. JDA 644–45. This letter crossed in the mail with a letter from Regal to Local 370 in which Regal gave notice of its intent to convert to manager-operated theaters and to eliminate the projectionist position as of November 24, 1997. JDA 640. Regal did offer to bargain, however, over the effects of its decision. JDA 640. Although the parties met in October 1997, Local 370 refused to bargain over the effects of Regal's decision while Regal refused to bargain over the decision itself. As a result, Regal terminated the remaining projectionists at the end of their shifts on November 23, 1997 and converted the five theaters to manager-operated.

### 2. Local 364

Regal purchased Montrose Movies in 1994, thereby assuming its predecessor's bargaining relationship with Local 364, the IATSE affiliate that represented dedicated projectionists in the Akron, OH area. Although Regal and Local 364 entered into a collective bargaining agreement in 1994, the parties began negotiations anew in 1995 when Regal purchased two other theaters in the area. The parties eventually reached agreement on a contract that combined all three theaters under a single collective bargaining agreement, effective October 13, 1995 to October 12, 1997.

---

**1.** The collective bargaining agreement between Local 370 and Regal's predecessor contained a similarly worded management rights clause. *Compare* JDA 525 *with* JDA 590. According to Local 370, the purpose of *that* clause was to enable the employer to update equipment and to accommodate technological changes in projection work. JDA 199–200, 245–47.

JDA 580–85. This contract contained a management rights clause identical to the one included in Regal's collective bargaining agreement with Local 370. *Compare* JDA 583 *with* JDA 590. Once again, however, the parties did not discuss the management rights clause during the contract negotiations. JDA 443.

On July 21, 1997, Regal notified Local 364 that it intended to convert to manager-operated theaters and to eliminate the projectionist position. JDA 637. Local 364 responded to Regal's letter on August 25, 1997 and requested a meeting. JDA 639. The parties had difficulty communicating with one another throughout September and did not meet until October 8, 1997. JDA 444. At this meeting, Local 364 sought to negotiate a new collective bargaining agreement retaining the projectionist position; Regal, however, was willing to discuss only the effects of its conversion decision. JDA 444–46. No meeting occurred after this date. Regal therefore terminated the remaining projectionists at the end of their shifts on October 12, 1997 and converted its Akron theaters to manager-operated.

### 3. Local 125

Regal purchased seven theaters in the Fort Wayne, IN area between 1993 and 1994. Local 125 represented the dedicated projectionists at these theaters and entered into separate collective bargaining agreements with Regal for the projectionists working at each theater. JDA 553–74. On January 2, 1996, Regal notified Local 125 of its decision to terminate these contracts and to convert to manager-operated theaters. JDA 604. Regal subsequently agreed to delay the conversion of three of the theaters, however, in exchange for wage concessions. JDA 347–48, 358–62.

The final contract between Regal and Local 125 contained a management rights clause nearly identical to those included in its contracts with Local 370 and Local 364. *Compare* JDA 596 *with* JDA 583 *and* 590. Although Regal negotiators testified that the purpose of the management rights clause was to allow Regal to convert to manager-operated theaters without first having to bargain with Local 125, JDA 496, very little discussion of the clause took place during the negotiations.[2] JDA 349–51. The agreement between Regal and Local 125 was in effect from March 29, 1996 to March 28, 1997. JDA 593–99.

On January 16, 1997, Local 125 contacted Regal in an attempt to negotiate a successor agreement. JDA 605. Regal soon informed the union, however, that it had decided to convert the remaining Fort Wayne theaters to manager-operated and to eliminate the projectionist position. JDA 606. Subsequent negotiations proved futile as Regal refused to bargain over its conversion decision and Local 125 refused to bargain over the effects of Regal's decision. As a result, Regal terminated the remaining projectionists at the end of their shifts on March 28, 1997 and converted the theaters to manager-operated.

### C. The Board's Decision and Order

As a result of the foregoing events, the three Locals filed unfair labor practice charges against Regal. After investigating the claims, the Board's General Counsel issued separate complaints against Regal, which were subsequently consolidated for hearing and decision. After a hearing on the consolidated complaint, an Administrative Law Judge (ALJ) concluded that Regal violated sections 8(a)(1) and 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(1),

---

**2.** Discussion of the management rights clause was limited to Regal's authority under the clause to annex an entertainment center, called a "funscape," without first bargaining with Local 125. JDA 349–51.

(a)(5), by refusing to bargain with the Locals before converting to manager-operated theaters and terminating the union-represented projectionists. JDA 20. Rejecting Regal's arguments under *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), and *Dubuque Packing Co.*, 303 N.L.R.B. 386, 1991 WL 146795 (1991), the ALJ held that Regal had a duty to bargain under *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), and *Torrington Industries, Inc.*, 307 N.L.R.B. 809, 1992 WL 127799 (1992). JDA 16–17. Applying a waiver analysis, the ALJ also rejected Regal's argument that the management rights clause authorized Regal to convert to manager-operated theaters without first bargaining to impasse. JDA 17–19. Lastly, the ALJ rejected Regal's argument that Local 364 failed to timely demand bargaining over Regal's conversion decision. JDA 19. The ALJ then ordered Regal, among other remedies, to reinstate the terminated projectionists to their former or substantially equivalent positions. JDA 20.

The Board adopted the ALJ's rulings, findings and conclusions in its June 20, 2001 decision and order. JDA 9. Adopting the ALJ's conclusion that Regal violated sections 8(a)(1) and 8(a)(5) of the NLRA by refusing to bargain over its conversion decision, the Board emphasized the ALJ's finding that "the reclassification or transfer of bargaining unit work to managers or supervisors is a mandatory subject of bargaining where it has an impact on unit work" and stated that Regal "both transferred unit work to existing managers and also hired new assistant managers to perform [that work.]" JDA 9. With respect to the management rights clause, the Board concluded that Regal's "decisions were not founded on any new technological development" and that "there was no clear and unmistakable waiver of bargaining regarding the allocation of the work among different classifications of employees." JDA 9. The Board upheld the ALJ's remaining conclusions without comment and affirmed the ALJ's remedial order.[3] JDA 11.

## II. Analysis

We address each of Regal's challenges to the Board's findings below.

### A. The Statutory Duty to Bargain

■ On review, Regal first argues that the Board erroneously concluded that it had a duty to bargain with the Locals over its decision to convert to manager-operated theaters and thereby eliminate the projectionist position. Regal's argument includes two distinct claims. First, Regal maintains that the Board erroneously concluded that its conversion to manager-operated theaters constituted a "transfer of bargaining unit work." Second, Regal contends that the Board applied the incorrect legal standard to determine whether Regal had a duty to bargain.

■ We must uphold the Board's factual findings "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *Cobb Mech. Contractors, Inc. v. NLRB*, 295 F.3d 1370, 1375 (D.C.Cir.2002). Thus, with respect to findings of fact, we "may [not] displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474,

---

**3.** Although he concurred in the result reached by the Board majority, Chairman Hurtgen disagreed with the ALJ's reliance upon *Fibre-board* and *Torrington*, as well as with the ALJ's application of a waiver analysis to the management rights clause. JDA 11–12.

488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Reviewing the Board's construction of the NLRA, including its classification of bargaining subjects as "terms and conditions of employment," 29 U.S.C. § 158(d), we afford the Board's judgment "considerable deference," *Ford Motor Co. v. NLRB*, 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979). We therefore uphold the Board's construction of the Act if it is "reasonably defensible." *Id.* at 497, 99 S.Ct. at 1849.

Because substantial evidence supports the Board's finding that Regal transferred bargaining unit work to managers and assistant managers, and because the Board acted reasonably in adopting the ALJ's application of *Fibreboard* and *Torrington* to the instant case, we uphold the Board's conclusion that Regal had a duty to bargain over its decision to convert to manager-operated theaters.

### 1. Substantial Evidence

■ Regal argues that the Board erred in finding that its conversion to manager-operated theaters resulted in a transfer of bargaining unit work to managers and assistant managers. Specifically, Regal maintains that the Board's "mischaracterization" stemmed from three factual errors, namely (1) "finding that there was any legally significant transfer of work at all"; (2) "finding no 'link' between the change in technology and the decision to [convert] to manager-operated theaters"; and (3) "finding that Regal 'hired new assistant managers to perform' unit work." Br. for Pet'r at 23, 25, 28 (quoting JDA 9). Because the Board's factual findings are supported by "substantial evidence," however, Regal's sundry challenges must fail. 29 U.S.C. § 160(e).

First, Regal argues that "the Board erred in finding that there was any legally significant transfer of work at all." Br. for Pet'r at 23. Emphasizing the technological advances that have changed the projectionist position over the years, Regal maintains that "[t]he assignment of the few remaining minimal tasks to managers and assistant managers cannot, in any real sense, be characterized as a transfer of work." *Id.* at 24. As the General Counsel correctly observes, however, we have previously recognized that the transfer of less work than occurred here is not a mere *de minimis* violation of the employer's duty to bargain where the change results in the loss of bargaining unit jobs. *Int'l Union, UAW v. NLRB*, 381 F.2d 265, 266 (D.C.Cir.), *cert. denied*, 389 U.S. 857, 88 S.Ct. 82, 19 L.Ed.2d 122 (1967) (finding adverse impact on bargaining unit where change in company's shipping method resulted in loss of six bargaining unit jobs).[4] Although technological advances have undoubtedly changed the scope of a projectionist's duties, the record amply supports the Board's finding that the typical projectionist still performs a number of tasks. JDA 163–71, 210–21, 363–70, 432–35. Given the existence of such tasks, plus the undisputed fact that Regal's managers and assistant managers assumed these tasks after the conversion to manageroperated theaters, *see* Br. for Pet'r at 24, substantial evidence supports the Board's finding that

---

4. Regal attempts to distinguish *International Union* by arguing that "nothing in the … decision … suggests that the work underlying the jobs at issue had disappeared; rather, the work apparently continued to exist at full historic levels, the only difference being that the employer assigned it to a different work group." Reply Br. at 7. Regal's suggestion to the contrary notwithstanding, the record amply supports the Board's finding that Regal "continues to employ the same methods and techniques for showing movies that it employed before it eliminated the dedicated projectionist position." JDA 9; *see* JDA 207–09, 324, 351, 436–37.

a "legally significant" transfer of work occurred as a result of the conversion.

Next, Regal asserts that the Board erred "in finding no 'link' between the change in technology and the decision to [convert] to manager-operated theaters." Br. for Pet'r at 25. Although the General Counsel concedes that "the motion picture industry experienced a period of dramatic technological change, resulting in the automation of numerous tasks previously performed by projectionists," Br. for Resp't at 43, Regal maintains that "[t]he decision to eliminate the [projectionist] position cannot be evaluated separately from the decision to automate," Br. for Pet'r at 27. Yet Regal's argument ignores a crucial fact: no advances in projection technology occurred after 1995 and before the present litigation. JDA 208–09, 324, 351, 436–37. Indeed, most of the technological advances took place during the 1980s. JDA 208–09, 324, 351, 436–37. Notably, Regal does not challenge the ALJ's conclusion that "the same duties that the union projectionists had been performing ... prior to the [conversion] are still required and performed." JDA 18. Substantial evidence thus supports the Board's conclusion that Regal's "decisions were not founded on any new technological development." JDA 9.

Finally, Regal argues that the Board erred "in finding that Regal 'hired new assistant managers to perform' unit work." Br. for Pet'r at 28 (quoting JDA 9). The Board's conclusion stemmed from the ALJ's explicit finding that Regal hired assistant managers to replace, at least in part, the terminated projectionists. JDA 16–17. Regal maintains that its payroll records "do not permit a conclusion that Regal hired new assistant managers to replace the projectionists on a one-for-one basis." Br. for Pet'r at 28. Any increase in management staffing may be explained, Regal asserts, by normal seasonal fluctuations in business, the release of a block-buster film ("Titanic") and the temporary need to train managers and assistant managers to perform projectionist duties. Reply Br. at 8–11. Neither the Board nor the ALJ concluded, however, that Regal hired new assistant managers to replace the projectionists on a one-for-one basis. JDA 16 n.2 ("I find ... that some new assistant mangers have replaced projectionist[s] although not necessarily on a quid pro quo basis."). In addition to Regal's payroll records, JDA 73–115, testimonial evidence supports the Board's conclusion that Regal hired some additional managerial employees to perform projectionist duties after the conversion to manager-operated theaters, JDA 187–88, 227–31, 295–98. Although the evidence presents "two fairly conflicting views" of Regal's staffing increases after the conversion, *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465, substantial evidence supports the Board's findings.

### 2. The Reasonableness of the Board's Approach

Having concluded that substantial evidence supports the Board's finding that Regal's conversion to manager-operated theaters resulted in a transfer of bargaining unit work, we now consider Regal's claim that the Board applied the incorrect legal standard to determine whether Regal had a duty to bargain over the conversion decision itself. On review, Regal maintains that the Board did not engage in the proper bargainability analysis because it implicitly "relied on the approach of *Torrington* to the exclusion of the approach in *First National Maintenance*." Br. for Pet'r at 22. Given our decision in *Rock-Tenn Co. v. NLRB*, 101 F.3d 1441 (D.C.Cir.1996), which upheld as reasonable the Board's application of *Fibreboard* and *Torrington* to a subcontracting decision that turned on labor cost considerations and involved " 'the same work under simi-

lar conditions of employment,'" *id.* at 1446 (quoting *Fibreboard,* 379 U.S. at 213, 85 S.Ct. at 404), we must reject Regal's challenge.

### a. The Legal Framework

Under section 8(a)(5) of the NLRA, an employer commits an unfair labor practice by "refus[ing] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The obligation to "bargain collectively" requires an employer to "confer in good faith with respect to wages, hours, and other terms and conditions of employment." *Id.* § 158(d). An employer thus violates section 8(a)(5) by unilaterally changing an existing term or condition of employment without first bargaining to impasse.[5] *Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 198, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991).

The Supreme Court has interpreted the statutory phrase "terms and conditions of employment" in two well-known decisions. In *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), the Court considered whether a company's decision to hire an independent contractor to perform maintenance work previously performed by union employees violated the NLRA. Noting that "the [c]ompany merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment," *id.* at 213, 85 S.Ct. at 404, the Court held that the company's decision to "contract out" its maintenance work fell within the phrase "terms and conditions of employment" and, consequently, its unilateral action violated the NLRA, *id.* at 215, 85 S.Ct. at 405. The Court cautioned, however, that its decision "does not encompass other forms of 'contracting out' or 'subcon-

tracting' which arise daily in our complex economy." *Id.*

Nearly two decades later, the Supreme Court further defined the duty to bargain in *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), which involved the company's decision to cancel a service contract following a fee dispute and its subsequent firing of the union employees it had hired to work on the cancelled job. In *First National Maintenance,* the Court identified three types of management decisions: (1) those that have "only an indirect and attenuated impact on the employment relationship," such as decisions regarding advertising and financing; (2) those that "are almost exclusively 'an aspect of the relationship' between employer and employee," such as decisions related to production quotas and work rules; and (3) those that have "a direct impact on employment ... but [have] as [their] focus only the economic profitability of" the business. *Id.* at 676–77, 101 S.Ct. at 2580 (quoting *Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 178, 92 S.Ct. 383, 397, 30 L.Ed.2d 341 (1971)). The Court concluded that the employer's decision to close part of its business belonged in the third category. *Id.* at 677, 101 S.Ct. at 2580. Such decisions require mandatory bargaining, the Court reasoned, "only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." *Id.* at 679, 101 S.Ct. at 2581. Applying this balancing test, the Court held that the company did not have an obligation to bargain before closing part of its business for purely economic reasons. *Id.* at 686, 101 S.Ct. at 2584–85. Although the Court

---

**5.** An employer who violates section 8(a)(5) also derivatively violates section 8(a)(1), which makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of" their statutory labor rights. 29 U.S.C. § 158(a)(1).

"intimate[d] no view as to other types of management decisions, such as plant relocations ... [and] other kinds of subcontracting," *id.* at 686 n. 22, 101 S.Ct. at 2585 n. 22, it did observe that "*Fibreboard* implicitly engaged in [the balancing] analysis" described above, *id.* at 679, 101 S.Ct. at 2581.

Despite the Supreme Court's observation that *Fibreboard* and *First National Maintenance* represent a consistent analytical approach by which to determine the subjects of mandatory bargaining, the Board's attempts to integrate the two decisions have generated some degree of confusion. Guided by the principles of *First National Maintenance,* the Board subsequently developed a burden-shifting test in *Dubuque Packing Co.,* 303 N.L.R.B. 386, 1991 WL 146795 (1991), *enforced in relevant part sub nom. United Food & Commercial Workers Local 150–A v. NLRB,* 1 F.3d 24 (D.C.Cir.1993), to determine whether an employer's decision to relocate bargaining unit work necessitated mandatory bargaining.[6] We affirmed the Board's decision on review, stating that the test "accords with [Supreme Court] precedent [and] is fully defensible." *United Food,* 1 F.3d at 32. The Board did not apply *Dubuque*'s burden-shifting test in *Torrington Industries, Inc.,* 307 N.L.R.B. 809, 1992 WL 127799 (1992), however, because the case involved not a relocation decision but a subcontracting decision, factually similar to *Fibreboard,* in which the employer simply replaced unit employees with non-unit employees to perform the same work. Given that the Supreme Court had already addressed this form of subcontracting in *Fibreboard,* the Board reasoned that "there is no need to apply any further tests in order to determine whether the decision is subject to the statutory duty to bargain." *Id.* at 810.

### b. Regal's Challenge

Here, the Board affirmed the ALJ's conclusion that the *Fibreboard/Torrington* approach governed Regal's decision to convert to manager-operated theaters and thereby eliminate the projectionist position. This conclusion stemmed directly from the ALJ's determination that Regal "has continued to operate the same business at the same locations and the only change is in the identity of the employees doing the work." JDA 16. On review, Regal maintains that the Board's decision cannot be sustained due to its reliance upon *Torrington,* a decision that, in its view, "creates a virtual '*per se*' rule that is incompatible with the test established in *First National Maintenance.*" Br. for Pet'r at 17. Because the Board's decision is both "reasonably defensible," *Ford Motor Co.,* 441 U.S. at 497, 99 S.Ct. at 1849, and consistent with this court's precedent, *see, e.g., Rock-Tenn,* 101 F.3d at 1446, we reject Regal's challenge.

Regal's argument relies chiefly upon the Third Circuit's decision in *Furniture Rentors of America, Inc. v. NLRB,* 36 F.3d

---

**6.** Under *Dubuque Packing*'s burden-shifting test, the General Counsel must first establish a *prima facie* case "that the employer's decision involved a relocation of unit work unaccompanied by a basic change in the nature of the employer's operation." *Dubuque Packing,* 303 N.L.R.B. at 391. If the General Counsel successfully establishes a *prima facie* case, the burden shifts to the employer to demonstrate that (1) "the work performed at the new location varies significantly from the work performed at the former plant;" (2) "the work performed at the former plant is to be discontinued entirely and not moved to the new location;" or (3) "the employer's decision involves a change in the scope or direction of the enterprise." *Id.* Alternatively, the employer may show that either (1) "labor costs ... were not a factor in the decision" or (2) even if they were a factor, "the union could not have offered labor cost concessions that could have changed the employer's decision to relocate." *Id.*

1240 (3d Cir.1994), which criticized the Board for applying the *Torrington* standard to an employer's decision to subcontract delivery services because of employee theft. Noting that "[i]nflexibly applied, the holding in *Torrington* is at odds with the principles of *Fibreboard* and *First National [Maintenance]*," *id.* at 1247, the Third Circuit decried "the *Torrington* manner of examining [a] decision to subcontract only to see whether it is analogous to *Fibreboard*'s general factual framework" as "simplistic and ... potentially ham-handed," *id.* at 1248. Determining whether a subcontracting decision requires mandatory bargaining necessitates, the Third Circuit reasoned, an examination of the reasons motivating the decision. *Id.* Citing the Third Circuit's favorable discussion of *Dubuque, id.* at 1246–48, Regal argues that the Board should have applied *Dubuque*'s burden-shifting framework to Regal's decision to convert to manager-operated theaters.

■ The Third Circuit's criticisms of *Torrington* aside,[7] we have long held that "[t]he allocation of work to a bargaining unit is a 'term and condition of employment'" and that "an employer may not unilaterally attempt to divert work away from a bargaining unit without fulfilling [its] statutory duty to bargain." *Road Sprinkler Fitters Local Union No. 669 v.*

*NLRB,* 676 F.2d 826, 831 (D.C.Cir.1982) (reviewing "double-breasted" operation in which single employer transferred unit work from union side of firm to non-union side of firm). We have likewise recognized that *"First National Maintenance* is inapposite" to transfer of work cases in the context of double-breasted operations, finding *Fibreboard* to be the "more apt precedent." *Road Sprinkler Fitters Local Union No. 669 v. NLRB,* 789 F.2d 9, 16 n. 22 (D.C.Cir.1986) (reaffirming "the principle that the diversion of bargaining unit work is a mandatory subject of bargaining").

Most recently, in *Rock-Tenn,* we upheld the Board's application of *Fibreboard* to an employer's decision to permanently subcontract its trucking operations to a third party, thereby eliminating the unit work previously performed by the employer's union-represented drivers. *Rock-Tenn,* 101 F.3d at 1446. Concluding that the Board "permissibly distinguishe[d] what it calls a *Fibreboard* subcontract from a relocation decision," *i.e.,* the type of decision at issue in *Dubuque Packing,* we held that it is "a permissible reading of the [NLRA] in light of the Supreme Court opinions to hold that when a subcontracting decision turns on labor cost considerations and involves 'the same work under similar conditions of employment,' it is a prototype *Fibreboard* case regardless of the alleged

---

**7.** Although Regal correctly observes that *Geiger Ready–Mix Co. of Kansas City v. NLRB,* 87 F.3d 1363, 1369 (D.C.Cir.1996) (holding that Board reasonably relied upon "transfer of unit work" approach in case involving double-breasted employer), cited *Furniture Rentors* with approval, the *Geiger* decision maintained that "the [court's transfer of work] approach ... is not inconsistent with the Third Circuit's analysis in *Furniture Rentors*." Specifically, the court stated that "[t]he Third Circuit rightly pointed out that whether unilateral action violates the [NLRA] depends less on the '*form* that the employer's decision takes' and more on the 'reasons motivating the decision.' " *Id.* (quoting *Furni-*

*ture Rentors,* 36 F.3d at 1248 n. 4 (emphasis in original)). The court recognized, however, that "[a] change in the employer's *established* use of its union and nonunion sides in work assignments will almost always involve factors within the union's control." *Id.* (emphasis in original). Accordingly, transfer of work decisions will almost always be suitable for resolution within the collective bargaining framework. *See id.* The unusual contracting decision in *Furniture Rentors*—where the employer hired a subcontractor because of employee theft—is thus the exception, not the rule, where transfer of work decisions are concerned.

futility of bargaining." *Id.* (quoting *Fibreboard,* 379 U.S. at 213, 85 S.Ct. at 404).

Although the instant case involves a transfer of unit work to managers and assistant managers, and not a transfer of unit work to an outside subcontractor, we find this distinction to be irrelevant. What matters, in our view, is that Regal, like the employer in *Rock-Tenn,* transferred " 'the same work' " performed by the union-represented projectionists to its managers and assistant managers " 'under similar conditions of employment,' " and did so, not because of technological change but, instead, to reduce its labor costs. *Id.* Given our conclusion that substantial evidence supports the finding that Regal's conversion to manager-operated theaters resulted in a transfer of bargaining unit work, we find the ALJ's legal approach, adopted by the Board, to be "reasonably defensible." *Ford Motor Co.,* 441 U.S. at 497, 99 S.Ct. at 1849.

### B. The Management Rights Clause

Next we address Regal's argument that the Board erroneously interpreted the management rights clause contained in the collective bargaining agreements between Regal and the Locals. According to Regal, the Board erred in applying a waiver analysis to the management rights clause because the clause arguably covered Regal's decision to convert to manager-operated theaters. Thus, Regal maintains, the Board should have analyzed the management rights clause under standard contract law principles. This argument fails.

■■■ Although a union may waive its statutory protection against an employer's unilateral changes in subjects of mandatory bargaining, we will not infer such a waiver from a general contractual provision unless the waiver is " 'clear and unmistakable.' " *Honeywell Int'l, Inc. v. NLRB,* 253 F.3d 125, 133 (D.C.Cir.2001) (quoting *Metro. Edison Co. v. NLRB,* 460

U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983)). In determining whether a union has clearly and unmistakably waived its bargaining rights, we consider the language of the collective bargaining agreement as well as the bargaining history between the parties "when it is crucial to understanding the purpose behind the contractual language." *Local Union No. 47, IBEW v. NLRB,* 927 F.2d 635, 640 (D.C.Cir.1991). Waiver analysis does not apply, however, if a collective bargaining agreement "covers" the challenged action. *NLRB v. United States Postal Serv.,* 8 F.3d 832, 836–37 (D.C.Cir. 1993) (*USPS*). Unlike waiver, by which a union knowingly and voluntarily relinquishes its right to bargain, if a subject matter is "covered by" a collective bargaining agreement, "the union has exercised its bargaining right and the question of waiver is irrelevant." *Dep't of Navy v. FLRA,* 962 F.2d 48, 50 (D.C.Cir.1992). In such a case, "the resolution of the refusal to bargain charge rests on an interpretation of the contract at issue." *USPS,* 8 F.3d at 837.

■■■ Applying a waiver analysis, the Board concluded that the management rights clause did not constitute a "clear and unmistakable waiver of bargaining regarding the allocation of the work among different classifications of employees." JDA 9. Relying upon our decision in *USPS,* 8 F.3d at 836–38, Regal argues that the Board should have applied a "covered by" analysis to the management rights clause. Specifically, Regal argues that the management rights clause, which expressly authorized Regal "to introduce new or improved work methods ... processes and procedures" and "to change or eliminate existing ... procedures or work," JDA 583, 590, 596, implicitly afforded Regal "the right to change or eliminate projectionist work" without first bargaining, Br.

for Pet'r at 32–33. Regal attempts to buttress its reading of the management rights clause by emphasizing, among other contextual factors, the fact that the parties adopted the clause only after Regal had made known to the Locals its intent to convert all of its theaters to manager-operated.

Regal's reliance on *USPS* is misplaced. Although Regal correctly observes that we rejected the Board's "crabbed reading of the 'waiver'/'covered by' distinction" in *USPS*—a reading which relied upon the fact that the management rights clause did not specifically refer to the type of employer decision at issue in the case—Regal overlooks crucial differences between the management rights clause at issue in *USPS* and its own. *USPS*, 8 F.3d at 838. The broadly worded management rights clause in *USPS* gave the Postal Service "the exclusive right" "[t]o hire promote, transfer, assign, and retain employees in positions within the Postal Service," "[t]o maintain the efficiency of the operations entrusted to it" and "[t]o determine the methods, means, and personnel by which such operations are to be conducted." *Id.* at 835. Rejecting the Board's waiver analysis, we held that the above language "covered" the Postal Service's unilateral decision to change the work schedules of its employees. *Id.* at 838.

Here, Regal advocates a more expansive reading of a much narrower management rights clause. Unlike the clause in *USPS*, *id.* at 835, Regal's management rights clause does not grant the authority to "hire, promote, transfer, assign, and retain employees," *see* JDA 583, 590, 596. As the General Counsel observes, the plain language of the clause involves "only the right to introduce new technology, machinery, and methods for the projectionists to execute the tasks they are to perform." Br. for Resp't at 37. In fact, the clause mentions "employees" only with respect to Re-

gal's obligation "to negotiate the effects [of such decisions] on the employees." JDA 583, 590, 596. Regal thus fashions its "covered by" argument around the language giving it the authority to change or eliminate existing methods, procedures "or work." JDA 583, 590, 596. But Regal's actions here are not embraced by the literal language of the management rights clause. As discussed above, the record shows that Regal's decision involved no change in the "methods" or "procedures" of projection and no elimination of "work." Rather, Regal merely transferred to managers work that was previously done by projectionists. Moreover, we have previously cautioned that "the canon of *ejusdem generis* ('of the same kind or class') counsels against . . . reading [a] general phrase to include conduct wholly unlike that specified in the immediately preceding list of prohibited acts." *Mohave Elec. Coop., Inc. v. NLRB*, 206 F.3d 1183, 1191–92 (D.C.Cir. 2000). We therefore find that the language of the management rights clause fails to support Regal's argument that the clause authorized its unilateral decision to convert all of its theaters to manager-operated.

The bargaining history between Regal and the Locals likewise fails to support Regal's claim. Although Regal repeatedly emphasizes that it made known to the Locals its intent to convert all of its theaters to manager-operated before they separately agreed to the management rights clause, Regal "does not and apparently [cannot] show that any specific discussions occurred during negotiations that equated or tied in that 'intention' with its introduction of the management rights clause." JDA 18. Absent such affirmative evidence, we are loath to conclude that a union would knowingly agree to a clause that would effectively permit the employer to unilaterally extinguish the bargaining unit altogether. Hence, Regal's argument

that the Locals should have understood that the management rights clause permitted Regal to eliminate the projectionist position simply fails. Accordingly, we affirm the Board's conclusion that the Locals did not clearly and unmistakably waive their right to bargain over the transfer of unit work to non-unit employees. *See Honeywell Int'l,* 253 F.3d at 133.

### C. Failure to Timely Request Bargaining

█ Asserting that Local 364 failed to timely demand bargaining over the effects of its conversion decision, Regal further argues that Local 364 should be deemed to have waived its right to bargain over the conversion decision itself. Because the Board—upholding the ALJ's decision without comment—reasonably concluded that a more prompt response to Regal's conversion decision would have been futile, we reject Regal's challenge.

█ If an employer gives a union advance notice of its intention to make a change to a term or condition of employment, "it is incumbent upon the [u]nion to act with due diligence in requesting bargaining" in order to avoid waiving any of its claims under the NLRA. *Golden Bay Freight Lines,* 267 N.L.R.B. 1073, 1080, 1983 WL 24885 (1983). A union is "not required to go through the motions of requesting bargaining," however, if it is clear that an employer has made its decision and will not negotiate. *Gratiot Cmty. Hosp.,* 312 N.L.R.B. 1075, 1080, 1993 WL 421718 (1993), *enforced in relevant part,* 51 F.3d 1255, 1259–60 (6th Cir.1995). The Board does not require "futile gestures," *id.,* because "[n]otice of a *fait accompli* is simply not the sort of timely notice upon which the waiver defense is predicated," *Int'l Ladies' Garment Workers Union v. NLRB,* 463 F.2d 907, 919 (D.C.Cir.1972).

On review, Regal argues that Local 364 waived any right it may have had to demand bargaining by not being available to meet until October 8, 1997, almost three months after Regal originally notified the Local of its conversion decision and only days before the decision's implementation. Noting that "a formal request to bargain about [Regal's] decision would [have been] futile," the ALJ concluded that Local 364's "failure to quickly respond to [Regal's] notice . . . is no defense to [Regal's] unilateral action." JDA 19. The record provides substantial support for the ALJ's conclusion. As the General Counsel correctly observes, Regal's July 21, 1997 letter to Local 364 "did not ask the [Local] to negotiate a proposal to eliminate the dedicated projectionist position," Br. for Resp't at 46, but simply informed it that "the Company has decided to go manager operated in the Akron area theaters" and that "its decision has the effect of eliminating the projectionist's [sic] positions," JDA 637. Moreover, when the parties finally met in October 1997, Regal steadfastly refused to bargain over its decision, informing the Local that the decision had "been made months ago and [could not] be changed." JDA 454. The Board's decision reviewing Regal's untimeliness contention is thus a reasonable one and is therefore affirmed.

### D. The Board's Remedial Order

█ Lastly, we turn to Regal's claim that the Board's remedial order does not effectuate the purposes of the NLRA and, accordingly, is unenforceable. Having found that Regal violated the NLRA by converting to manager-operated theaters without first bargaining with the Locals, the Board ordered Regal, among other remedies, to reinstate the terminated projectionists. JDA 11, 20–21. Because Regal's compliance with the Board's remedial order is not unduly burdensome, Regal's challenge fails.

Under section 10(c) of the NLRA, the Board has the authority "to take such af-

firmative action[,] including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act]." 29 U.S.C. § 160(c). Consistent with this provision, the purpose of a remedial order is "to 'restor[e] the economic status quo that would have obtained but for the company's wrongful [action.]'" *Southwest Merch. Corp. v. NLRB*, 53 F.3d 1334, 1344 (D.C.Cir.1995) (quoting *NLRB v. J.H. Rutter–Rex Mfg. Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969)). We have previously recognized, however, that reinstatement is an inappropriate remedy if it would be "unduly economically burdensome" for the employer. *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 957–58 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989). To demonstrate undue burden, the employer must show that "the Board's [remedial] order would require a substantial outlay of new capital or otherwise cause undue financial hardship." *Id.* at 958.

Relying chiefly on *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831 (4th Cir.2000), Regal first argues that "a restoration remedy is beyond the authority of the Board when the unfair labor practice does not involve discriminatory conduct." Br. for Pet'r at 39–40. Regal's reliance upon *Dorsey Trailers* is misplaced. Although the Fourth Circuit refused to enforce the Board's restoration order in *Dorsey Trailers*, the decision rested, in part, upon the court's conclusion that the employer *did not violate* its duty to bargain when it unilaterally closed one of its manufacturing plants. *Dorsey Trailers*, 233 F.3d at 845. Contrary to Regal's assertions, this court has recognized restoration as a presumptively valid remedy where the employer

violates its duty to bargain. *See Power, Inc. v. NLRB*, 40 F.3d 409, 425 (D.C.Cir. 1994) (employer unilaterally subcontracted bargaining unit work).

 On somewhat firmer ground, Regal next argues that we should not enforce the Board's reinstatement order because reinstating the terminated projectionists would impose an undue burden upon its business. Specifically, Regal maintains that the Board's order is unduly burdensome because it "would force Regal to spend significant amounts of money to pay employees to spend the vast majority of their time doing nothing." Br. for Pet'r at 40. Regal's argument fails, however, because the Board's remedial order does not require "capital expenditures," "the importation of expertise not now possessed," or "the coordination of ... activities that [Regal] lacks the experience and expertise to effectively handle." JDA 11. Regal's bare statements about the economic costs of reinstating the terminated projectionists fail to meet our "undue burden" test. *See Teamsters Local Union*, 863 F.2d at 958. Given the "high degree of deference" we afford the Board's choice of remedies, *Teamsters Local 115 v. NLRB*, 640 F.2d 392, 399 (D.C.Cir.), *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981), we affirm the Board's remedial order reinstating the terminated projectionists.[8]

### III. Conclusion

For the foregoing reasons, the petition for review is denied and the cross-application for enforcement is granted.

*So ordered.*

---

8. As the Board noted below, however, Regal is not precluded from presenting new evidence on the reinstatement issue at the compliance stage of this proceeding. *See, e.g., Lear Siegler, Inc.*, 295 N.L.R.B. 857, 861–62, 1989 WL 224179 (1989).