# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 19, 2018　　　　　　Decided May 29, 2018

No. 15-1336

INTERNATIONAL LONGSHORE & WAREHOUSE UNION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL ASSOCIATION OF MACHINISTS AND
AEROSPACE WORKERS, AFL-CIO; DISTRICT LODGE 190;
LOCAL LODGE 1546; DISTRICT LODGE 160, ET AL.,

INTERVENORS

———

Consolidated with 16-1123

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Robert S. Remar* argued the cause for the Petitioner. *Eleanor Morton* and *Emily M. Maglio* were with him on brief.

*Amy H. Ginn*, Attorney, National Labor Relations Board, argued the cause for the Respondent. *Richard F. Griffin*, *Jr.*, General Counsel at the time the brief was filed, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney, were with her on the brief.

*David A. Rosenfeld* was on the brief for Intervenors International Association of Machinists and Aerospace Workers, *et al.*, in support of the Respondent and Cross-Petitioner.

Before: HENDERSON, KAVANAUGH and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: The post-World War II growth in international maritime shipping has spawned a history of labor disputes along the West Coast of the United States between the Petitioner, the International Longshore and Warehouse Union (ILWU), and the Intervenor, the International Association of Machinists and Aerospace Workers, AFL-CIO (IAM). The battles between the two unions have played out in federal court, *see Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*, 253 F. App'x 625 (9th Cir. 2007), and before the National Labor Relations Board (NLRB or Board), *see Pac. Mar. Ass'n*, 256 NLRB 769, 772 (1981). This case adds a chapter to the unions' protracted disputes.

In 2002, the Pacific Crane Maintenance Company (PCMC) began using a subsidiary,[1] the Pacific Marine Maintenance Company (PMMC) (together, Employer or PCMC/PMMC), to provide loading and unloading services to Maersk, a large shipping company, at three West Coast ports: Oakland and Long Beach, California and Tacoma, Washington. PCMC created PMMC to perform the Maersk contract because Maersk had purchased the terminal operations from a company named Sealand, which, as a condition of sale, *required* Maersk to recognize IAM as the union representative for the employees performing maintenance and repair (M&R) work at the three ports. Because PCMC was already bound by a collective bargaining agreement (CBA) with ILWU, it could not recognize IAM itself. Thus, from 2002 to 2006, PCMC continued to recognize ILWU while its subsidiary, PMMC, recognized IAM as the representative of the M&R employees at the Oakland and Tacoma ports.[2]

In late 2004, in an effort to drive down costs, Maersk requested bids from both PCMC and PMMC for M&R work at the Oakland and Tacoma ports. PCMC responded with the lower bid and Maersk accepted it. As a result of losing the Oakland and Tacoma M&R work, on March 30, 2005, PMMC terminated its 100 M&R employees and shut down its operations completely. The next day, PCMC hired 76 of the former PMMC mechanics to do the same M&R work and hired

---

[1] PCMC joined with another company, Marine Terminals Corporation, to create PMMC. As discussed *infra*, the parties have stipulated that PCMC and PMMC are a "single employer" and, accordingly, Marine Terminals Corporation has no relevance to the case.

[2] For reasons discussed *infra*, the Long Beach terminal is no longer at issue.

six additional former PMMC mechanics shortly thereafter. As a result of the change, however, PCMC ceased recognizing IAM and began recognizing ILWU as the former PMMC M&R employees' union. IAM responded with claims of unfair labor practices and the NLRB General Counsel brought charges against ILWU, PMMC and PCMC under the National Labor Relations Act, 29 U.S.C. §§ 151-169 (NLRA or Act). With a few exceptions no longer at issue, the administrative law judge (ALJ) recommended dismissing the charges. The Board disagreed, concluding that the Employer was obligated to bargain with IAM over the termination of PMMC's unit employees and that the Employer's recognition of ILWU was unlawful. Ultimately, PCMC and PMMC settled the claims, leaving ILWU as the sole Petitioner.

ILWU raises three challenges to the Board's Decision and Order. First, it contends that the Board erred in concluding that the Employer was obligated to bargain with IAM over its decision to shut down PMMC and terminate its workforce. Second, it argues that the Board improperly excluded evidence that the M&R employees merged by accretion into the ILWU West Coast-wide employee bargaining unit. Third, it disputes the propriety of the Board remedy. For the following reasons, we deny ILWU's petition and grant the Board's cross-application for enforcement.

## I. BACKGROUND

Maersk, and companies like it, transport goods around the world in large container ships packed with 20-foot metal containers. At port terminals, the shipping containers are unloaded by cranes and transported to off-site locations where they are "stripped" and distributed to their final destinations. The inverse process includes "stuffing" containers off-site and eventually loading them onto the cargo ships for export at the

terminals.  *See* Joint Appendix (JA) 693, 1218-19.  The machinery and the containers used in this process periodically need maintenance and repair.  Port-terminal contract repair companies, like the Employer, employ M&R mechanics to ensure the process runs smoothly.

The Board has previously chronicled the history of ILWU and IAM.  *See, e.g.*, *Shipowners' Ass'n of the Pac. Coast*, 7 NLRB 1002 (1938); *Pac. Mar. Ass'n*, 256 NLRB 769, 772 (1981).  We note, however, that the two unions have different organizational models.  In the port-terminal context, IAM represents only M&R mechanics and it usually does so on a local level, dividing its bargaining units either by terminal or by company.  This was the case from the 1960s to the early 2000s, when IAM operated as the exclusive union representative for the single-employer, multi-terminal bargaining unit of M&R mechanics at Long Beach, Oakland and Tacoma.

ILWU is more inclusive.  Its bargaining unit is composed of a West Coast-wide group of longshoremen, stevedores, marine clerks, planners and longshore mechanics.  A single CBA, the Pacific Coast Longshore and Clerks Agreement (PCL&CA),[3] binds ILWU, on one side, and the Pacific Maritime Association (PMA), a collection of approximately 70 maritime employers along the Pacific Coast (including PCMC), on the other.  Pursuant to the PCL&CA, ILWU and

---

[3] The PCL&CA CBA comprises multiple documents, including (1) the Pacific Coast Clerks Contract Document (PCCCD), which governs marine clerks and planners; (2) the Pacific Coast Longshore Contract Document (PCLCD), which governs longshore workers, including stevedores and longshore mechanics; and (3) the Safety Code Contract.  JA 479-82; 610-16.  We refer to the documents together as the PCL&CA.

PMA have established an employment dispatch system that is in effect along the Pacific Coast. The system operates through a series of "halls" that match employees to employers on a flexible basis so that labor can flow to the terminals that need it most. The Employer describes this system as its "lean staffing model." JA 412.

This chapter of the unions' story began in 1999, when Maersk purchased the Oakland, Tacoma and Long Beach port operations[4] from Sealand. As a condition of the sale, Sealand required Maersk to recognize IAM as the M&R mechanics' union in all three locations.

At that time, PCMC was performing M&R work for Maersk in Los Angeles and it was interested in expanding its work to the three newly acquired Maersk terminals.[5] Because PCMC was bound by the PCL&CA to recognize ILWU, however, Sealand's IAM-recognition requirement prevented PCMC from performing the work. In order to get around this obstacle, PCMC created PMMC. PMMC then bid on, and won, the Maersk contract. Thereafter, PMMC recognized IAM and

---

[4] Maersk leased terminals from the ports. For example, Maersk leased berths 20-24 at the Port of Oakland and contracted with PMMC to do its M&R work at those berths. *See Ports Am. Outer Harbor, LLC*, 366 NLRB No. 76, 2018 WL 2086090 (May 2, 2018) (deciding PCMC/PMMC successorship issues).

[5] PMMC's Oakland and Tacoma terminals served a second shipping company, Horizon Lines, which accounted for a small portion of PMMC's work. Horizon received the same services as Maersk through a contractual "me-too" relationship tied to Maersk's contract with PMMC. Maersk was the primary shipping company, however, and Horizon Lines had no role in the contract negotiations described herein.

began performing the M&R work at the former Sealand terminals.

On March 31, 2002, the IAM-Sealand (now IAM-PMMC) CBA was set to expire. Around the same time, Maersk consolidated its Southern California operations by merging its M&R workforce into a single terminal (Pier 400) in the Port of Los Angeles. As a result of the consolidation, Maersk no longer needed PMMC's services at the Long Beach terminal and instead contracted with PCMC to do its M&R work at the new consolidated Los Angeles terminal. As for the Oakland and Tacoma terminals, PMMC and IAM agreed to a CBA extension from April 1, 2002 to March 31, 2005 but did so only after more than a dozen bargaining sessions and a strike vote of unit employees.

In late 2004, with the March 31, 2005 CBA expiration date looming, Maersk solicited bids from both PCMC and PMMC for work at the Oakland and Tacoma terminals. PCMC submitted a bid of $64.46 per hour and PMMC submitted a bid of $72.88 per hour. At the ALJ hearing, PCMC and PMMC representatives explained the difference in price. PCMC representative Joseph Gregorio testified that the discussion regarding the different bid prices "always was focused upon the concept that there was differences [sic] in labor costs," including "benefits and pensions." JA 92. Similarly, PMMC informed Maersk that its higher bid resulted from a "collection of [employee] benefits." JA 172.

Maersk selected PCMC to do the work. Accordingly, on January 25, 2005, Maersk terminated its maintenance contract with PMMC, effective March 31, 2005. On January 26,

PMMC notified IAM, informing it and its unit employees[6] that PMMC intended to terminate its operations on April 1. PMMC also explained how the unit employees could apply for employment with PCMC to continue working the same jobs. In early February, IAM requested that PMMC bargain over its decision to terminate work at the Oakland and Tacoma terminals. PMMC agreed to bargain over the effects of the terminations but asserted that it was Maersk's decision—not PMMC's—to use PCMC to perform the M&R work. Thus, PMMC refused to bargain about its decision to shut down operations.

Effective April 1, 2005, PMMC permanently "laid off" all of its M&R mechanics. JA 899-900 (Letter from Terry Murphy, PMMC Vice President, to IAM representatives). On March 31, PCMC hired 76 of the PMMC unit mechanics, requiring them to accept ILWU as their bargaining representative.[7] PCMC hired six more former PMMC mechanics shortly thereafter. For the most part, the mechanics continued to perform the same work at the same locations with the same tools and equipment. One difference was that PCMC began to transfer mechanics temporarily between the former-

---

[6] Although the January 26 letter was addressed to IAM representatives, it was also "[p]osted and distributed to employees covered by the 2002-2005 IAM/PMMC contract." JA 900.

[7] When PCMC extended employment offers to former PMMC mechanics, it made clear that "[a]ll of our operations are covered by our coast-wide contract with [ILWU]." JA 908. Specifically, the PCL&CA contained a "union security" clause providing that "[a]ny employee who becomes fully registered during the life of the Agreement shall . . . become and remain a member of the [ILWU] in good standing as a condition of employment." JA 665. Thus, ILWU membership was an explicit requirement of PCMC employment.

PMMC terminals of Oakland and Tacoma and other nearby terminals in accordance with the PCL&CA hiring halls and its "lean staffing model."

In early 2005, IAM pressed unfair labor practice (ULP) charges against PMMC and PCMC as "a single employer" and alternatively as "alter egos" under sections 8(a)(1), (2), (3), and (5) of the NLRA[8]; it subsequently filed ULP charges against ILWU under sections 8(b)(1)(A)[9] and (2).[10]   In 2007, the

---

[8]  Section 8(a) provides:

> It shall be an unfair labor practice for an employer . . . (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 . . . (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . (5) to refuse to bargain collectively with the representatives of his employees . . . .

29 U.S.C. § 158(a).

[9]  Section 8(b)(1)(A) provides, in relevant part, that it "shall be an unfair labor practice" for a union to "restrain or coerce . . . employees in the exercise of the rights guaranteed in section 157," 29 U.S.C. § 158(b)(1)(A), including, *inter alia*, the right to "self-organization" and the right to "bargain collectively through representatives of their own choosing," *id.* § 157.

[10]  Section 8(b)(2) provides: "It shall be an unfair labor practice for a labor organization or its agents . . . to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect

NLRB General Counsel filed a complaint alleging similar ULPs and moved to consolidate its charges with those filed by IAM. An ALJ granted the General Counsel's motion and heard the consolidated case in a 41-day hearing between September 13, 2007 and June 20, 2008. During the hearing, the parties narrowed the issues. First, PCMC and PMMC stipulated that they were a single employer. JA 608. The General Counsel disavowed any "successor" or "alter ego" theories of liability and agreed that the Employer had properly engaged in "effects bargaining." On February 12, 2009, the ALJ issued his opinion, recommending dismissal of all charges against ILWU and dismissal of all but one[11] charge against the Employer.

The Board rejected the ALJ's dismissal recommendations. It concluded that the Employer had violated sections 8(a)(5) and (2) of the NLRA, based largely on "the parties' stipulation that PMMC and PCMC were at all times material a single employer." *Pac. Crane Maint. Co., Inc. &/or Pac. Marine Maint. Co., LLC*, 359 NLRB 1206, 1207 (2013) (*PCMC/PMMC I*). The Board also held that ILWU violated sections 8(b)(1)(A) and (2) of the NLRA by accepting assistance and recognition from the Employer as the exclusive collective bargaining representative of the unit employees at a time when ILWU did not represent an uncoerced majority of unit employees. *Id.* at 1213.

---

to whom membership in such organization has been denied or terminated . . . ." 29 U.S.C. § 158(b)(2).

[11] The ALJ found that the Employer violated sections 8(a)(1) and (5) of the NLRA by removing IAM material posted on a bulletin board at the Maersk terminal before March 31, 2005. That finding is not challenged here.

The Employer and ILWU originally sought review in the United States Court of Appeals for the Ninth Circuit. *Pac. Crane Maint. Co. v. NLRB*, No. 13-72463 (9th Cir. July 12, 2013). While that appeal was pending, the United States Supreme Court decided *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), which led to the vacatur and remand of the original Board decision. On June 17, 2015, the Board reviewed the ALJ's opinion *de novo* and issued the Order *sub judice* in which it reached the same conclusions it had reached in its 2013 decision. *Pac. Crane Maint. Co., Inc. &/or Pac. Marine Maint. Co., LLC*, 362 NLRB No. 120, 2015 WL 3791632 (June 17, 2015) (*PCMC/PMMC II*). The Board Order requires ILWU, *inter alia*: (1) to cease and desist from the unfair labor practices found and from interfering with or coercing employees in the exercise of rights under section 7 of the Act; (2) to decline recognition as the exclusive bargaining representative unless and until it is certified by the Board; and (3) along with the Employer, to reimburse unit employees for all initiation fees, dues and other moneys paid to ILWU or withheld from their wages by the Employer. *Id.* at *8-9. PCMC/PMMC subsequently settled the claims against it for approximately $130,000 per employee. ILWU petitions this Court for review and the Board cross-applies for enforcement of its Order.

## II.  EMPLOYER'S DUTY TO BARGAIN

"We will uphold a decision of the Board unless it relied upon findings that are not supported by substantial evidence, failed to apply the proper legal standard, or departed from its precedent without providing a reasoned justification for doing so." *E.I. Du Pont De Nemours & Co. v. NLRB*, 682 F.3d 65, 67 (D.C. Cir. 2012). The Board's findings of fact are "conclusive" if supported by substantial evidence. 29 U.S.C. § 160(e).

This case comes to us in an unusual posture. Because PCMC/PMMC settled its dispute with the Board and IAM, we are called upon to review only the Board's conclusion that ILWU violated sections 8(b)(1)(A) and (2) of the NLRA by accepting the Employer's recognition as the union representative of the M&R mechanics at the Oakland and Tacoma ports. To review that determination, however, we must first determine whether *the Employer* had an obligation to bargain with IAM under sections 8(a)(5) and (d) before it shut down PMMC's operations. As we discuss *infra*, we conclude that the Employer had such an obligation—and violated it.

A union violates section 8(b)(1)(A) by exercising exclusive bargaining authority when it does not, in fact, have the support of an uncoerced majority of the employees in the relevant bargaining unit. *Int'l Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 733 (1961) (applying 29 U.S.C. § 158(b)(1)(A)). Section 8(b)(2) prohibits a union from causing or attempting to cause "an employer to discriminate against an employee" by requiring the employee to adhere to a union-security clause imposed on behalf of a union that does not represent a majority of the employees in the appropriate bargaining unit. 29 U.S.C. § 158(b)(2); *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 413-14 (1960). The purpose of both provisions is clear: neither an employer nor a union may unilaterally override the employees' organizational rights, including the right to select bargaining representatives of their choosing. *See* 29 U.S.C. § 157; *see also Radio Officers' Union of Commercial Telegraphers Union v. NLRB*, 347 U.S. 17, 40 (1954).

Key to our ultimate decision is whether IAM—rather than ILWU—continued as the appropriate representative of the M&R mechanics at the Oakland and Tacoma terminals once PMMC ceased operations. Put simply, if IAM remained the

appropriate union for the unit employees, ILWU was not permitted to accept the Employer's recognition. On this issue, ILWU has two arguments. First, it argues that the Employer properly terminated its relationship with IAM when it shut down PMMC's operations without bargaining and therefore PCMC—as a separate corporate entity—could hire employees without regard to their past IAM representation. Second, ILWU asserts that the employees formerly represented by IAM merged by accretion into the existing ILWU West Coast-wide bargaining unit. We address these arguments in turn.

### A. *Employer's Termination Decision*

Under section 8(a)(5), an employer commits an unfair labor practice if it "refuse[s] to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5). Under the NLRA, collective bargaining consists of a "mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." *Id.* § 158(d). The subjects of mandatory bargaining are broad and the Supreme Court has explained that "Congress deliberately left the words 'wages, hours, and other terms and conditions of employment' without further definition, for it did not intend to deprive the Board of the power further to define those terms in light of specific industrial practices." *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 675 (1981) (quoting 29 U.S.C. § 158(d)).

Under section 8(d), an employer's decision to replace employees in an "existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment" is a subject of mandatory bargaining. *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 215 (1964). Put differently, an employer may not

"unilaterally attempt to divert work away from a bargaining unit without fulfilling [its] statutory duty to bargain." *Rd. Sprinkler Fitters Local Union No. 669 v. NLRB*, 676 F.2d 826, 831 (D.C. Cir. 1982) ("double-breasted" employer has duty to bargain before diverting work from its union employees to its non-union employees). Accordingly, we have held that a movie theater employer had a duty to bargain with the union representing its movie-reel operators before transferring that work to its assistant managers. *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 307 (D.C. Cir. 2003). Our decision was based, in large part, on the fact that the employer "continued to operate the same business at the same locations and the only change [was] in the identity of the employees doing the work." *Id.* at 310 (quoting ALJ decision below). In other words, the nature of the theater's business itself was unchanged. *Id.* Thus, finding "no link" between a non-labor-cost reason for the change—*e.g.*, technological advances in the movie-projector business—and the theater's decision to reallocate work to assistant managers, we upheld the Board's conclusion that the reallocation of employee duties was based primarily on labor costs and therefore the subject of mandatory bargaining. *Id.* at 307.

At the same time, an employer's duty to bargain is not limitless and the NLRA does not prohibit a business from making independent economic decisions unrelated to labor relations. *First Nat'l Maint.*, 452 U.S. at 676-77. The duty to bargain "includes only issues that settle an aspect of the relationship between the employer and the employees." *Id.* at 676 (quoting *Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 178 (1971)). Bargaining is therefore mandatory "only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." *Id.* at 679. In *First National*, the Supreme Court held that the employer was not

required to bargain over its decision to shut down a portion of its maintenance business—and terminate many of its employees in the process—after the employer reduced its weekly rate from $500 to $250. 452 U.S. at 668. There, the employer made its strategic business decision "purely for economic reasons"—the reduced rate was not profitable and the client was not willing to pay the $500 rate—not in order to reduce labor costs or alter employee relations. *Id.* at 686.

When one company buys another, the transaction can qualify as a "core business decision" that falls outside the "terms and conditions" of employment contemplated by section 8(d). *See AG Comm'ns Sys. Corp.*, 350 NLRB 168 (2007), *pet. for review denied sub nom., Int'l Brotherhood of Elec. Workers, Local 21 v. NLRB*, 563 F.3d 418 (9th Cir. 2009) (*AG Communications*). *AG Communications* involved the merger of two telecommunication installation companies: AG and Lucent. *AG Comm'ns*, 563 F.3d at 421. Before the merger, the companies had CBAs with different unions: Lucent bargained with the Communications Workers of America (CWA) and AG bargained with the International Brotherhood of Electrical Workers, Local 21, AFL-CIO (Local 21). *Id.* After Lucent purchased AG, however, "Lucent began to merge AG into Lucent to streamline operations and to increase efficiency and profitability." *Id.* Following a period of integration, Lucent declared its intent to recognize only CWA. *Id.* Local 21 protested and demanded collective bargaining but the companies refused. *Id.* The Board sided with the merging companies, holding that the two companies became a single employer only *after* the merger took place and that the decision to merge was a "core business decision" motivated by operational efficiencies rather than labor costs. *Id.* at 422. The Ninth Circuit agreed with the Board. *Id.* at 421.

We conclude that the Employer was required to bargain over its decision to shut down PMMC's operations and transfer them to PCMC. First, the record makes clear that the difference in bid prices was based almost exclusively on labor-related costs, which are "peculiarly suitable for resolution within the collective bargaining framework." *First Nat'l Maint.*, 452 U.S. at 680 (quoting *Fibreboard*, 379 U.S. at 214). During the ALJ hearing, the Employer's representative, Joseph Gregorio, testified that the difference between PCMC's and PMMC's respective bid prices was attributable to the wages and benefits the companies provided to their respective M&R employees. JA 92 (explaining that negotiations regarding the difference between bid prices "always was focused upon the concept that there was differences [sic] in labor costs"). Similarly, PMMC informed Maersk that its higher costs resulted from a "collection of [employee] benefits." JA 172. Driving this point home, Maersk representative Wayne Pighin testified that Maersk selected PCMC's bid principally on the basis of its lower bid price. JA 161, 172.

In arguing that the transition from PMMC to PCMC was a "core entrepreneurial decision" rather than a term or condition of employment, ILWU attempts to attribute PCMC's lower bid to its "lean staffing model." Pet'r's Br. 20-24. This argument ignores the fact that PCMC's "lean staffing model" is tied to its membership in the PMA and the PMA's CBA with ILWU's West Coast-wide bargaining unit. If PCMC had not recognized ILWU as the union representing the former PMMC employees, it would not have had access to the hiring hall or the flexible transfer policies of the PCL&CA. Accordingly, we do not view the "lean staffing model" as an independent business construct unique to PCMC but instead as a provision of the PCL&CA applicable to every PMA employer. *See Sw. Steel & Supply, Inc. v. NLRB*, 806 F.2d 1111, 1113 (D.C. Cir. 1986) (CBA's hiring hall provision is subject of mandatory bargaining).

Our conclusion turns heavily on PMMC and PCMC's single-employer stipulation. *See Farmers Co-op. Elevator Ass'n Non-Stock of Big Springs, Neb. v. Strand*, 382 F.2d 224, 231 (8th Cir. 1967) ("The general rule is that parties are bound by stipulations voluntarily made . . . ."). By virtue of their stipulation, *both* PCMC and PMMC effectively conceded that they (together) were required to bargain with IAM about the "terms and conditions" of its members' employment at the Oakland and Tacoma terminals. *See RC Aluminum Indus., Inc. v. NLRB*, 326 F.3d 235, 239-40 (D.C. Cir. 2003) (explaining features of single-employer status in context of mandatory bargaining). The Employer's stipulation further distinguishes this case from *AG Communications*, where the merging companies became a single employer only *after* the two companies merged. 563 F.3d at 421. In light of the companies' single-employer status, ILWU's argument that PMMC simply made "a decision to close operations for economic reasons" on March 30, 2005 fails. Pet'r's Br. 20. As a single employer, PCMC/PMMC did not "close" its operations. Like the employer that reassigned duties in *Regal Cinemas*, 317 F.3d at 307, and the double-breasted employer that redistributed contract work from its union division to its non-union division in *Sprinkler Fitters*, 676 F.2d at 831, PCMC/PMMC unilaterally transferred work from one segment of its business to another, achieving its goal of lowered labor costs.

Nor did PMMC lose Maersk as a client, as was the case in *First National*. 452 U.S. at 669-70. Instead, the Employer's M&R work at the Maersk terminals continued uninterrupted the day after PMMC "closed." Except for a handful of employees, it was business as usual for the M&R mechanics at the Oakland and Tacoma terminals on March 31, 2005. The same M&R mechanics continued to work the same jobs in the same locations with the same equipment. *See Regal Cinemas*, 317 F.3d at 307. Indeed, the mechanics had the same customer

(Maersk). The only changes were their uniforms, JA 129-30, and the union representing them, JA 125-26. In every material sense, PCMC (as a single employer with PMMC) retained Maersk's business. Accordingly, we conclude that the Employer's decision to close PMMC was based primarily on labor costs and that it therefore had an obligation to bargain under sections 8(a)(5) and (d). When PCMC/PMMC refused IAM's bargaining request and unilaterally terminated its recognition of the Union, it breached that obligation.

## B. Employees' Bargaining Unit

Having concluded that PCMC/PMMC had an obligation to bargain with IAM, we turn to ILWU's "accretion" argument and the Board's determination of the appropriate bargaining unit. *See S. Prairie Constr. Co. v. Local No. 627*, 425 U.S. 800, 805 (1976) (employee bargaining unit must be analyzed apart from single-employer determination).

Under section 9(b) of the NLRA, the Board has authority to delineate employee bargaining units. *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 236 (D.C. Cir. 1996). In doing so, it looks to the "community of interest" among employees, which includes factors such as "skills and duties; wages and benefits; interchange between sites; functional integration; geographic proximity; centralized control of management, supervision, and labor relations; and bargaining history." *RC Aluminum Indus., Inc.*, 326 F.3d at 239-40. Although no single factor is controlling, "a group of employees with a significant history of representation by a particular union presumptively constitute[s] an appropriate bargaining unit." *Cmty. Hosps. of Cent. Cal. v. NLRB*, 335 F.3d 1079, 1085 (D.C. Cir. 2003). The Board therefore demands that "a party challenging a historical unit show that 'compelling circumstances' warrant modification of the unit." *Dodge of*

*Naperville, Inc. v. NLRB*, 796 F.3d 31, 39 (D.C. Cir. 2015) (citations omitted). Moreover, "[b]ecause the assessment requires a fact-intensive inquiry and a balancing of various factors, the Board has broad discretion in making the determination." *United Food & Commercial Workers v. NLRB*, 519 F.3d 490, 494 (D.C. Cir. 2008).

In weighing the "community of interest" of a merged workforce, the Board sometimes applies the doctrine of "accretion." *Dean Transp., Inc. v. NLRB*, 551 F.3d 1055, 1067 (D.C. Cir. 2009). "Accretion is the addition of a group of employees to an existing union-represented bargaining unit without a Board election." *Id.* "[B]ecause accretion essentially deprives employees of their statutory right to choose their bargaining representative, the Board has historically followed a restrictive policy in applying the accretion doctrine." *Id.* The Board will not find accretion unless "the employees sought to be added to an existing bargaining unit have little or no separate identity and share an overwhelming community of interest with the preexisting unit to which they are accreted." *Id.* (internal quotation marks and citations omitted). Importantly, when evaluating "community of interest" factors—whether in the context of accretion or otherwise—we have held that the Board should ignore "any impermissible changes made unilaterally by the employer." *Dodge of Naperville*, 796 F.3d at 39. "To hold otherwise would allow [the employer] to benefit from its own unlawful conduct." *In re Comar, Inc.*, 339 NLRB 903, 911 (2003), *enfd.*, 111 F. App'x 1 (D.C. Cir. 2004).

The history of IAM's multi-terminal bargaining unit is plain. It covers a 40-year period with the M&R employees at the Oakland and Tacoma terminals. ILWU does not contest that IAM was the legitimate union representative of the M&R mechanics at those locations before March 31, 2005. Nor could it, as Sealand's insistence on the continuity of IAM as the

mechanics' union prompted PCMC to create PMMC to perform the Maersk contract in the first place. JA 23 (PCMC/PMMC co-owner Steve McLeod testifying that "purpose of creating [PMMC] was to have an entity to respond to a proposal to do maintenance work for [Maersk]"). Indeed, PCMC/PMMC was *required* to recognize the IAM bargaining unit as a condition of the Sealand contract.

Moreover, the Board found as a fact that, "[a]s of March 31 . . . the unit employees generally continued to perform the same work at the same location, with the same tools and equipment as they had before the merger, working under separate immediate supervision from the ILWU-represented employees." *PCMC/PMMC I*, 359 NLRB at 1211. In other words, PCMC did not hire new M&R employees to handle its new business; nor did PCMC use its "lean staffing model" to hire outside mechanics to staff the newly acquired terminals. Instead, on the date the change in ownership took place, the very same group of employees continued their daily work. *See* JA 73 (Joseph Gregorio testifying that PCMC "decided [to] hire only the former IAM mechanics"). In the face of the unchallenged bargaining history and the evident employee continuity, we uphold the Board's determination that the M&R mechanics at Tacoma and Oakland constituted a proper bargaining unit represented by IAM. *See Cmty. Hosps. of Cent. Cal.*, 335 F.3d at 1085.

We reject the argument that the PMMC M&R employees were merged by accretion into the West Coast-wide ILWU workforce. Moreover, we decline ILWU's invitation to look past March 31 at all for our "community of interest" assessment because any post-March 31 "accretion" necessarily occurred *after* the Employer violated section 8(a)(5) by failing to bargain over its decision to switch operations from PMMC to PCMC. In these circumstances, the Board correctly discounted any

evidence tied to "impermissible changes made unilaterally by the employer." *Dodge of Naperville*, 796 F.3d at 39.

In sum, we hold that substantial evidence supports the Board's conclusion that the M&R employees at the Oakland and Tacoma ports were not part of ILWU's West Coast-wide bargaining unit and the Employer's duty to bargain with the existing IAM bargaining unit was not extinguished by virtue of the accretion doctrine. Because IAM continued as the appropriate bargaining representative for the M&R mechanics at the Oakland and Tacoma terminals after March 31, 2005, ILWU violated sections 8(b)(1)(A) and (2) of the NLRA when it accepted recognition from the Employer.[12]

### III. BOARD REMEDY

Finally, ILWU challenges the Board remedy. Specifically, ILWU points out that PCMC has ceased operations and paid roughly $130,000 to each of the approximately 100 unit employees formerly represented by IAM at the Oakland and Tacoma terminals as part of its settlement. Accordingly, it

---

[12] It is undisputed that the PCMC-ILWU CBA contains a "union-security" clause that requires membership in ILWU as a condition of PCMC employment, JA 665, and that PCMC enforced the clause when it hired the former PMMC mechanics, *see PCMC/PMMC I*, 359 NLRB at 1207; *see also* JA 908 (PCMC employment offer letter). Because the Board correctly determined that IAM—not ILWU—was the proper union representative of the M&R employees at the Oakland and Tacoma terminals, it also correctly concluded that ILWU had violated section 8(b)(2) by applying its CBA—including the "union-security" clause—to those employees. *PCMC/PMMC I*, 359 NLRB at 1207; *see Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 413-14 (1960).

argues that the Board remedy improperly provides a "windfall," or double recovery, to IAM. Pet'r's Br. 58.

Under section 10(e) of the NLRA, our review of Board decisions is limited to issues the parties in fact raised before the Board. 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board . . . shall be considered by the court . . . [absent] extraordinary circumstances."). "Application of section 10(e) is mandatory, not discretionary." *Oldwick Materials, Inc. v. NLRB*, 732 F.2d 339, 341 (3d Cir. 1984). Accordingly, if a party wishes to challenge an issue first raised in a Board decision, it must move for reconsideration so that the Board—not this Court—can address the question in the first instance. *See Nova Se. Univ. v. NLRB*, 807 F.3d 308, 316 (D.C. Cir. 2015).

Before the Board, ILWU did not challenge the Board remedy in light of the Employer's settlement with IAM and its members. Nor did ILWU move for reconsideration once it learned of the Employer's settlement.[13] Therefore, under section 10(e), we cannot modify the relief granted absent "extraordinary circumstances." *See NLRB v. Ochoa Fertilizer Corp.*, 368 U.S. 318, 322 (1961) ("[I]n the absence of a showing within the statutory exception of 'extraordinary circumstances' the failure or neglect of the respondent to urge an objection in the Board's proceedings forecloses judicial consideration of the objection in enforcement proceedings."). Finding nothing "extraordinary" about ILWU's unexcused failure to raise its arguments before the Board, we conclude

---

[13] The Employer moved for reconsideration regarding the merits of the Board Order. JA 1372. The Board denied the motion. *Id.* at 1376.

that ILWU's remedial challenge is not properly before us and we decline to address it.

That said, ILWU has an opportunity to make its objection known at the compliance stage of the Board proceedings. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984). The Board acknowledged as much in declaring that ILWU "may, in compliance proceedings, present evidence showing that particular remedial provisions are no longer appropriate. . . ." JA 1376 n.5 (March 1, 2016 Board Order Denying Reconsideration). This evidence will likely include, *inter alia*, the details of the Employer's settlement, which are not included in the record. *See* JA 1546-48 (letter explaining that ILWU does not have access to settlement documents). Thus, in any compliance proceeding, ILWU may make—and the Board may consider—the argument that the Employer's post-hearing settlement constitutes an offset of any amount the Board has determined ILWU owes.

For the foregoing reasons, we deny ILWU's petition for review and grant the Board's cross-application for enforcement against ILWU.

*So ordered.*